STATE of Wisconsin, Plaintiff-Respondent,

v.

Nancy J. PINNO, Defendant-Appellant.

STATE of Wisconsin, Plaintiff-Respondent,

v.

Travis J. SEATON, Defendant-Appellant.

Supreme Court

*No. 2011AP2424–CR & 2012AP918–CR.*
*Oral argument September 4, 2013.—Decided July 18, 2014.*

2014 WI 74

(Also reported in 850 N.W.2d 207.)

110

For defendant-appellant Nancy J. Pinno, there were briefs by *Len Kachinsky* and *Sisson and Kachinsky Law Offices,* Appleton, and oral argument by *Len Kachinsky.*

For the plaintiff-respondent, the cause was argued by *Gregory M. Weber,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

For defendant-appellant Travis J. Seaton, there were briefs by *Amelia L. Bizzaro* and *Bizzaro Law LLC,* Milwaukee, and oral argument by *Amelia L. Bizzaro.*

For the plaintiff-respondent, the cause was argued by *Daniel J. O'Brien,* with whom on the brief was *J.B. Van Hollen,* attorney general.

An amicus curiae brief was filed by *Robert J. Dreps, Aaron A. Seligman,* and *Godfrey & Kahn, S.C.,* Madison, on behalf of the Wisconsin Freedom of Information Council, the Wisconsin Broadcasters Association, and the Wisconsin Newspaper Association.

¶ 1. DAVID T. PROSSER, J. These cases are before the court on certification by the court of appeals,

pursuant to Wis. Stat. § (Rule) 809.61 (2011–12).[1] The court of appeals certified both *State v. Pinno* and *State v. Seaton* because these unrelated cases present the question whether the closure[2] of a public criminal trial without objection from the defendant is subject to a waiver analysis or a forfeiture analysis on review.[3]

¶ 2. Fond du Lac County Circuit Judge Richard J. Nuss (Judge Nuss) presided over jury trials in *Pinno* and *Seaton,* including the voir dire proceedings. In both voir dire proceedings, the judge said he wanted the public to leave the courtroom to make room for large jury panels. Neither defendant objected, and both defendants were later found guilty by juries in trials that were completely open after the juries were selected.

¶ 3. The defendants, Travis J. Seaton (Seaton) and Nancy J. Pinno (Pinno), pursued postconviction relief, and in both cases Judge Nuss found that the courtroom had never actually been closed to all members of the public not part of the jury panel. In Seaton's Wis. Stat. § 974.06 motion, filed almost four years after the guilty verdict, Seaton alleged that a second, unknown closure took place in his case when someone stood in front of the courtroom doors to prevent the public from reentering the courtroom. Judge Nuss denied all postconviction motions, and these appeals followed.

---

[1] All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

[2] References to a closed courtroom in this opinion refer to the exclusion of at least some members of the public from the courtroom. The opinion does not use "closure" to suggest that no one, other than the parties and their attorneys, is or was permitted to be present in the courtroom.

[3] *State v. Pinno,* Nos. 2011AP2424–CR & 2012AP918, unpublished slip op. (Wis. Ct. App. Dec. 5, 2012).

¶ 4. Seaton and Pinno argue that a violation of the public trial right is structural error, and the right is not forfeited by their failure to make timely objections. Both defendants argue in the alternative that they received ineffective assistance of counsel because their attorneys failed to timely object to the exclusion of the public from voir dire. In addition, Seaton argues that he was denied his right to an impartial judge when Judge Nuss failed to grant Seaton's recusal motion.

¶ 5. We reach the following conclusions.

¶ 6. First, the Sixth Amendment right to a public trial extends to voir dire. *Presley v. Georgia,* 558 U.S. 209, 213 (2010). A judge's decision to "close" or limit public access to a courtroom in a criminal case requires the court to go through an analysis on the record in which the court considers overriding interests and reasonable alternatives as set out in *Waller v. Georgia,* 467 U.S. 39, 45, 48 (1984). The court must make specific findings on the record to support the exclusion of the public and must narrowly tailor the closure. *Id.*

¶ 7. Second, the Sixth Amendment right to a public trial may be asserted by the defendant at any time during a trial. A defendant who fails to object to a judicial decision to close the courtroom forfeits the right to a public trial, so long as the defendant is aware that the judge has excluded the public from the courtroom. Although the Supreme Court has categorized a violation of the right to a public trial as a structural error, that categorization does not mandate a waiver analysis, and a defendant need not affirmatively relinquish his right to a public trial in order to lose it. It would be inimical to an efficient judicial system if a defendant could sit on his hands and try his luck in a closed courtroom only to argue after his conviction that his Sixth Amendment right to a public trial had been violated.

117

¶ 8. Third, the records in these cases are clear that neither Seaton nor Pinno objected to the alleged courtroom closure. In Seaton's case, the allegation that courtroom personnel prevented the public from reentering the courtroom does not alter the analysis because Seaton was aware of the initial exclusion. If courtroom personnel did prevent the public from coming back into the courtroom, that prevention was part of the initial exclusion. Therefore, Seaton and Pinno both forfeited their rights to a public trial.

¶ 9. Fourth, defendants must demonstrate prejudice to prove ineffective assistance of counsel when counsel fails to object to the closure of the courtroom. The categorization of the denial of the public trial right as structural error does not create a presumption of prejudice in ineffective assistance of counsel claims. Seaton and Pinno have not proven that they were prejudiced by their attorneys' failure to object to the exclusion of the public from the courtroom. Therefore, both defendants have failed to prove that their counsel was ineffective.

¶ 10. Finally, Seaton was not denied his right to an impartial judge. Judge Nuss's communications show that he was cognizant of his responsibilities under the Judicial Code of Conduct, and he did not appear to be biased. We presume that judges are impartial, and Seaton has not offered sufficient evidence to rebut that presumption. Therefore, Judge Nuss properly denied the recusal motion.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. *State v. Seaton*

¶ 11. Travis J. Seaton was charged with first-degree reckless homicide as a repeater contrary to Wis.

Stat. §§ 940.02(1) and 939.62(1)(c), on November 17, 2006. The charges stemmed from an incident that occurred in the early morning hours of November 15 in the City of Fond du Lac. Seaton was involved in an altercation with Keith Rockweit (Rockweit) outside a bar. Seaton threw a single punch that caused Rockweit to fall down and hit his head on the concrete pavement. Seaton was arrested a few minutes later about two blocks from the bar. Rockweit was taken to a hospital and treated for cerebral hemorrhaging and a broken jaw, but he died later that day.

¶ 12. Seaton engaged Attorneys Gerald P. Boyle and K. Richard Wells to represent him at trial, which was scheduled for March 24, 2008. Attorney Wells handled voir dire for the defendant.

¶ 13. Before voir dire began, Judge Nuss attempted to make room for the large incoming jury panel, indicating that he might clear the courtroom:

> THE COURT: All right. Couple housekeeping matters that the Court will then address. First of all, just for those others that are in attendance, . . . there's a hundred jurors coming in. Obviously we're short on space. And their comfort and availability will not be compromised by anyone else in the courtroom if it becomes necessary, I'm just going to excuse everybody in the courtroom, that's the way it's going to be. We'll have to be certainly sensitive to that, I'm certainly sensitive to the victim, I'm certainly sensitive to the Defendant, but jurors come first. And so the Court will address that.
>
> Let me just invite [the clerk's opinion]. With the space that we have, do you think the jurors will be able to be seated in here?
>
> THE CLERK: I believe so. Twenty-four in the jury box. We'll probably have to clear the courtroom first.

THE COURT: All right. And so we probably will do that just to be on the safe side.

¶ 14. No one objected.

¶ 15. The jury panel entered the courtroom at 9:40 a.m. Before the jury entered, the court disposed of several evidentiary issues and made the following concluding observation:

> [T]he Court wants to address those others in attendance. If there is one hint of one word of any juror at all for any reason, all are going out. Okay? I'm not going to pick and choose or identify any particular individual. Mum is the word while the Court is engaged in its voir dire . . . . I don't expect any comments made, I don't expect any snickering, I don't expect any outbursts, I don't expect anything. And if one person says one thing or makes one comment that I can hear up here, the whole courtroom is going to be cleared of those individuals. All right?

> (Jury enters the courtroom at 9:40 a.m.)

¶ 16. The record shows that the court actually seated 91 potential jurors, 14 of whom were ultimately selected for the jury. After the jurors were selected the court asked: "Does either attorney have any motions to make regarding the jury selection process?" Both the prosecutor, Assistant Attorney General Thomas L. Storm, and defense counsel, Richard Wells, specifically answered, "No, Your Honor." Then the jury was sworn and excused for lunch. Again the court asked counsel: "Counsel have anything for the Court?" Attorney Wells responded, "No."

¶ 17. On March 28, 2008, the jury found Seaton guilty of first-degree reckless homicide as a repeater, and on August 6, 2008, he was sentenced to 15 years in prison and 15 years of extended supervision. Seaton

moved for an order granting a mistrial,[4] which the circuit court denied in a written order on December 23, 2008.

¶ 18. On February 16, 2009, Seaton filed a postconviction motion pursuant to Wis. Stat. § 809.30. In that motion, Seaton argued that his sentence was too harsh, reasserted his argument that one of the jurors was biased, and argued that "other acts evidence" was used improperly. The circuit court held a hearing on the motion on April 2, 2009 and denied Seaton's motion in its entirety on April 13, 2009. On April 28, 2009, Seaton filed a notice of appeal. The court of appeals affirmed the circuit court on July 14, 2010. Seaton did not raise his present Sixth Amendment and ineffective assistance of counsel claims in the court of appeals.[5] On August 13, 2010, this court received Seaton's petition for review, which we subsequently denied.

¶ 19. On January 4, 2012, Seaton filed a Wis. Stat. § 974.06[6] motion and requested an evidentiary hearing.

---

[4] In the motion, Seaton alleged that one of the jurors encountered Seaton's aunt at a gas station before the trial and told her that he had read a news article about Seaton and was convinced that Seaton was guilty. The juror did not reveal that conversation during voir dire. At a hearing on the motion for a mistrial on October 31, the allegedly biased juror testified that he did not get the paper and did not read anything about the trial before it began. He said he did not talk to anyone about the trial before it began and did not know what the charges against Seaton were before trial.

[5] Up to this point, Seaton was represented by Boyle, Boyle & Boyle, S.C. Seaton subsequently retained Bizzaro Law LLC to petition this court for review after the first appeal and to pursue other postconviction relief.

[6] Wisconsin Stat. § 974.06(1) states:

(1) After the time for appeal or postconviction remedy provided in s. 974.02 has expired, a prisoner in custody under sentence of a court or a person convicted and placed with a

In the memorandum supporting his postconviction motion, Seaton argued for the first time that his Sixth Amendment right to a public trial was violated. In the alternative, Seaton argued that his counsel was ineffective for failing to object to the closure of the courtroom. Seaton attached an affidavit of Kevin Kirkpatrick (Kirkpatrick) to support his motion. Kirkpatrick said that Seaton's attorney had hired him to investigate whether the courtroom was closed to the public during voir dire. The affidavit alleged that someone stood outside the courtroom and prevented the public from reentering. Kirkpatrick said he attempted to get the names of the bailiffs who allegedly prevented the public from coming back into the courtroom, but Judge Nuss denied that request. In the affidavit, Kirkpatrick describes interviews conducted in November and December 2011 with several people who were present during voir dire.[7] Kirkpatrick filed an open records request on

volunteers in probation program under s. 973.11 claiming the right to be released upon the ground that the sentence was imposed in violation of the U.S. constitution or the constitution or laws of this state, that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

. . . .

(4) All grounds for relief available to a person under this section must be raised in his or her original, supplemental or amended motion. Any ground finally adjudicated or not so raised, or knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the person has taken to secure relief may not be the basis for a subsequent motion, unless the court finds a ground for relief asserted which for sufficient reason was not asserted or was inadequately raised in the original, supplemental or amended motion.

[7] On November 13, 2011, juror Lisa Krusick told Kirkpatrick that the jury box and courtroom seats were filled with

November 29, 2011, asking for the names of the bailiffs who prevented the public from reentering the voir dire proceedings and for the names of the deputies that were assigned to the courtroom on that day. Judge Nuss denied that request in a handwritten letter.[8]

¶ 20. Kirkpatrick wrote Judge Nuss to request an interview, but Judge Nuss declined that request in a letter dated December 29, 2011.[9] In his letter, Judge Nuss said, "Be advised that as presiding Judge and in

prospective jurors, and she could not recall anyone in the courtroom other than the attorneys and court officials. Juror Ruth Molloy told Kirkpatrick on November 15, 2011, that she did not remember anyone other than the judge being in the courtroom while Judge Nuss was questioning the potential jurors. Also on November 15, 2011, Roy Seaton said that he and his family were made to leave the courtroom, and he saw the victim's family leaving as well. He said that someone guarded the doors to prevent his family from reentering the courtroom. Seaton's mother, his wife, and his sister-in-law confirmed Roy Seaton's account. Deputy Michael Hardengrove told Kirkpatrick on November 29, 2011, that he did not remember whether he was working during the voir dire in Seaton's case, but he said that the public had been excluded from the courtroom in the past to make room for jurors when the jury pool was large. On December 7, 2011, David Lorenz, who was a potential juror but was not selected, told Kirkpatrick that only the attorneys and courtroom personnel were in the courtroom during voir dire. Courtroom clerk Cathy Mikle told Kirkpatrick on December 28, 2011, that she "vaguely remembered the courtroom being cleared."

[8] The note said, "Request denied given absence of proper basis, lack of justification warranting the same and in the public interest." In a post scriptum, Judge Nuss said, "This case was affirmed on appeal & petition for review before the Supreme Court denied. Given the same the Court considers this case closed."

[9] In the letter, Judge Nuss said that information about the bailiffs was not available when Kirkpatrick requested it earlier because the record was still at the Wisconsin Supreme Court,

order to insure that the integrity of the official court file and record are preserved, your request to interview me is being respectfully denied." Judge Nuss assured Kirkpatrick that he never denied any party the right to a public trial and cautioned Kirkpatrick that his interview request could "be considered as an 'ex parte communication' . . . . The Code of Judicial Ethics and Supreme Court Rules specifically prohibit[] a Judge from considering the same."

¶ 21. Also on December 28, Seaton's new attorney, Amelia Bizzaro (Attorney Bizzaro), filed an open records request with the Fond du Lac County Corporation Counsel for the names and contact information of the bailiffs assigned to Judge Nuss's courtroom on March 24, 2008. The Fond du Lac County Clerk of Courts granted the request in part on December 29, 2011, and supplied the names of the bailiffs but did not provide their contact information.

¶ 22. On January 4, 2012, the same day he filed the § 974.06 motion, Seaton also filed a motion requesting that Judge Nuss recuse himself. The circuit court held a hearing, on April 13, 2012, for argument on the § 974.06 and recusal motions. The hearing was limited to argument; it was not an evidentiary hearing.

¶ 23. At the hearing, Judge Nuss explained:

> What happened quite simply is that we had 91 jurors to come in and the Court in anticipation of that jury panel being brought in . . . noted that some individuals were seated in areas where quite frankly the jury panel was going to have to sit. I had to sit 67 people behind the rail someplace.

He said that he "wanted to be very respectful of the

but he said the Clerk of Courts would provide the information now that the record had been returned.

124

seating space limitation, preventing unnecessary non-jurors from intermingling with and compromising the jury panel, protection of the jurors to maintain that impartiality and really most importantly to ensure and promote the protection of the defendant's right to a fair and impartial jury." Judge Nuss also explained:

> But what happened was this Court did nothing more than excuse those that in fact were in the courtroom to step out until that jury was brought in . . . . And the Court was very careful never to lock it, never to close it . . . . It was for the sole and exclusive purpose of facilitating the sitting of the jury. *Once that jury was seated those individuals were welcome back in.* We tried to bring the jury up as close as we could. We did that. There was space. *There were others there.*

(Emphasis added.)

¶ 24. At the hearing, Judge Nuss denied the request for an evidentiary hearing as well as the motions for recusal and postconviction relief, and he issued a written order denying the same on April 16, 2012. Seaton appealed the denial of the § 974.06 and recusal motions on April 23, 2012.

## B. *State v. Pinno*

¶ 25. Judge Nuss presided at a second, unrelated jury trial approximately 21 months after the *Seaton* verdict. The case involved Nancy J. Pinno who was accused of assisting her biological son, Brandon Mueller (Mueller), in disposing of the body of his girlfriend, whom Mueller had killed a few weeks earlier. Pinno purportedly transported the woman's body in her car to the house of a friend. There, Mueller and Pinno's friend burned the body before they dumped the woman's ashes into a hole they drilled in the ice on Lake Winnebago.

¶ 26. Unsurprisingly, the case drew wide attention as it preceded Mueller's homicide and corpse mutilation trial. Pinno's attorney filed a motion on November 10, 2009, to change the venue or to bring in jurors from another venue because of the high level of publicity that the case had received.[10] Pinno went to trial on December 14, 2009, on charges of mutilating a corpse as a party to the crime contrary to Wis. Stat. §§ 940.11(1) and 939.05 and resisting or obstructing an officer contrary to Wis. Stat. § 946.41(1).

¶ 27. Pinno was represented by Attorney Catherine Block (Attorney Block). In the first hour of the trial, before voir dire, Judge Nuss made several comments about excusing non-jurors during voir dire.

> MS. BLOCK: The two gentlemen who just walked in are friends of Nancy Pinno. They are not witnesses.
>
> THE COURT: They will be excused during the voir dire.
>
> MS. BLOCK: Understand.
>
> THE COURT: So as soon as we get done with the current issues . . . we'll then, as far as those non jurors are concerned, they're all going to be excused. And there are no victim's family issues here. . . . [T]here's victim family, but there's nobody here in that regard, correct?
>
> MS. WERNER: Not yet. There will be.
>
> THE COURT: Later, okay. I just want to give deference—a victim certainly is entitled to be in the courtroom during voir dire, and I just want to respect that. So if they are here, I want to give deference to that. If they are not here, it's a nonissue.

---

[10] The court denied the motion at a hearing on November 16, 2009.

MS. WERNER: They will be here this morning.

THE COURT: Okay. But once we start voir dire there won't be anybody coming in and out of here until after the jury is selected.

¶ 28. Before the jury came in, Judge Nuss said:

Others that are in the courtroom, . . . when we come back we're going to take a brief recess when we come back. Other than the jury, nobody will be in the courtroom. Okay. So just have the jury panel in here. I want no one else in here during the entire voir dire process until the jury is selected. Any press in here? (No response) I want no press in here either.

. . . .

Any other housekeeping? (No response.) Excellent. Let's recess . . . .

No one objected to the order closing voir dire. After the recess and before the jury came in, Judge Nuss gave counsel an opportunity to raise any concerns when he asked, "Any other matters that require judicial intervention before we have the jury brought in?" District Attorney Daniel Kaminsky replied, "Nothing from the State." Attorney Block responded, "I don't believe so, Your Honor."

¶ 29. After the jury was selected, Judge Nuss asked counsel: "Does either attorney have any motions to make regarding the jury selection process?" Both District Attorney Kaminsky and Attorney Block replied: "No, Your Honor."

¶ 30. On December 18, 2009, the jury found Pinno guilty of mutilating a corpse as a party to the crime and of obstructing an officer. She was sentenced to seven and a half years of confinement and five years of extended supervision for the mutilating a corpse count,

and nine months of confinement to be served consecutively for obstructing an officer.[11] On August 3, 2011, Pinno filed a postconviction motion pursuant to Wis. Stat. § 974.02, arguing that she was denied her right to a public trial when the judge removed the public from the courtroom during voir dire. In the alternative, she argued that her counsel was ineffective for failing to object to the clearing of the courtroom.

¶ 31. At the evidentiary hearing for the postconviction motion, Judge Nuss explained:

> I believe we had a jury panel of 85, there might have been 83 or something that actually showed up . . . .
>
> . . . .
>
> And so the Court given due respect to the public trial aspect of this matter recognized that during voir dire . . . the Court had no choice other than to limit admission of the public to the courtroom in the interest of justice and for other reasons that I'll comment on. But it was a numbers issue at that point.

Judge Nuss put his clerk, who was sitting in the courtroom during voir dire, on the stand, and she stated that the courtroom "was never locked." The clerk also said that "there [were] people that were in the courtroom and that were allowed to come in and out of the courtroom" during the voir dire process, but she could not remember who came in and could not describe them.

¶ 32. Attorney Block also took the stand during the motion hearing. Attorney Block testified that she did not object to the court's exclusion of the public

[11] Pinno was represented by Attorney Catherine Block until the postconviction stage of the proceedings, at which point Attorney Leonard Kachinsky was appointed to represent her.

because "[t]he motion or the order of the Court or the statement of the Court was never readdressed [after they took a break] and therefore I never brought it up again or objected to it as I didn't believe it had taken place." Attorney Block said that because the court did not try to close the courtroom after the break, she felt no need to address it. In addition, Attorney Block thought that the presence of the public could potentially negatively affect voir dire and noted "that the media coverage up to the trial was relatively inflammatory in nature." Pinno's postconviction counsel said, "I would have to agree to some extent with [the District Attorney] that you can't fault Ms. Block too much for not interrupting the Court in the middle of the Court's Statement. . . . That's not clearly the strongest prong of our motion in this case."

¶ 33. After hearing all the evidence, Judge Nuss denied Pinno's motion orally and explained his reasoning:

> With regard to the issue of closure, I just want to make it eminently clear here, I never closed the courtroom. The courtroom was never closed. It was never secured. It was never locked. The word was never mentioned. There seems to be an aura of emphasis that this was in fact a closed hearing. It was not.

The court made it clear that it wanted to ensure that the jury pool was not tainted in any way and noted that "what is of importance also is the publicity that this case had gotten . . . ."

¶ 34. The circuit court issued a written order denying Pinno's postconviction motion on October 3, 2011. Pinno filed a notice of appeal on October 14, 2011.

¶ 35. As noted, these cases came to this court on certification, which we accepted on February 25, 2013.

## II. STANDARD OF REVIEW

¶ 36. This court applies constitutional principles to historical facts to determine whether a criminal defendant was denied his Sixth Amendment right to a public trial. *State v. Ndina,* 2009 WI 21, ¶ 45, 315 Wis. 2d 653, 761 N.W.2d 612. We uphold the circuit court's findings of historical fact unless they are clearly erroneous. *Id.* "The appellate court determines the application of constitutional principles to those evidentiary or historical facts independently of the circuit court and court of appeals but benefiting from those courts' analyses." *Id.* (footnote omitted).

¶ 37. Both cases raise ineffective assistance of counsel claims. "Whether counsel was ineffective is a mixed question of fact and law." *State v. Balliette,* 2011 WI 79, ¶ 19, 336 Wis. 2d 358, 805 N.W.2d 334 (citation omitted). We will uphold the circuit court's findings of fact unless they are clearly erroneous, but ultimately, whether counsel provided ineffective assistance is a question of law subject to de novo review. *Id.* (citations omitted).

¶ 38. Seaton argues that he is entitled to an evidentiary hearing based on his Wis. Stat. § 974.06 motion. Whether a postconviction motion is sufficient to require an evidentiary hearing is a question of law that an appellate court reviews de novo. *Id.,* ¶ 18. If the motion sets forth facts that, if true, would entitle the defendant to relief, normally the circuit court must hold an evidentiary hearing. *Id.* "However, if the motion does not raise facts sufficient to entitle the movant to relief, or presents only conclusory allegations, or if the record

conclusively demonstrates that the defendant is not entitled to relief, the circuit court has the discretion to grant or deny a hearing." *State v. Allen,* 2004 WI 106, ¶ 9, 274 Wis. 2d 568, 682 N.W.2d 433 (citations omitted).

¶ 39. Finally, Seaton argues that Judge Nuss should have recused himself. Whether a judge is required to recuse himself is a question of law subject to de novo review. *State v. Walberg,* 109 Wis. 2d 96, 104–05, 325 N.W.2d 687 (1982); *State v. Goodson,* 2009 WI App 107, ¶ 7, 320 Wis. 2d 166, 771 N.W.2d 385.

## III. DISCUSSION

¶ 40. The Sixth Amendment to the United States Constitution provides an accused the right to a public trial:[12]

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial

---

[12] Persons other than the defendant may invoke the right to a public trial under the First Amendment. *See Presley v. Georgia,* 558 U.S. 209, 212 (2010) (citing *Press-Enterprise Co. v. Superior Court of Cal., Riverside Cnty.,* 464 U.S. 501 (1984)). However, our analysis is limited to the Sixth Amendment right to a public trial. *See Presley,* 558 U.S. at 213 ("The extent to which the First and Sixth Amendment public trial rights are coextensive is an open question, and it is not necessary here to speculate whether or in what circumstances the reach or protections of one might be greater than the other.").

In addition to the First and Sixth Amendments, Wis. Stat. § 757.14 also provides a basis for the public trial right. That statute says:

> The sittings of every court shall be public and every citizen may freely attend the same, except if otherwise expressly provided by law on the examination of persons charged with crime; provided, that when in any court a cause of scandalous or obscene

jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const. amend. VI. The Supreme Court has determined that the public trial right is applicable to the

nature is on trial the presiding judge or justice may exclude from the room where the court is sitting all minors not necessarily present as parties or witnesses.

Wis. Stat. § 757.14; *see State ex rel. La Crosse Tribune v. Circuit Court for La Crosse Cnty.*, 115 Wis. 2d 220, 233, 340 N.W.2d 460 (1983) (applying Wis. Stat. § 757.14 to voir dire proceeding). The defendants do not mention this statute in their briefs as it would likely not provide the remedy they seek. In *La Crosse Tribune,* the court ordered that the transcript be given to the plaintiff newspaper as a remedy for the judge's improper decisions to hold voir dire in his chambers and to exclude the reporter. *Id.* at 224–30, 241 (noting also that "no meaningful order affecting the [defendant's] trial could be issued by this court" because voir dire had been completed and the trial was over).

Thus, the remedies available under Wis. Stat. § 757.14, namely, the production of the transcript of the private proceeding, would be insufficient to grant the desired relief to the defendants here. We need not decide today whether someone other than the defendant can seek additional remedies under that statute. Moreover, Supreme Court "cases have uniformly recognized the public-trial guarantee as one created for the benefit of the defendant." *Presley,* 558 U.S. at 213 (quoting *Gannett Co. v. DePasquale,* 443 U.S. 368, 380 (1979)). Although the public generally has an independent right to attend public trials, it would seem odd to allow a reversal of a judgment based on the demand of a member of the public. Therefore, while the judge's orders in these cases likely violated Wis. Stat. § 757.14, that issue is not before us, and the defendants' claims and requested remedies stem from the Sixth Amendment.

132

states based on its incorporation into the Fourteenth Amendment. *See Presley,* 558 U.S. at 211–12 (citing *In re Oliver,* 333 U.S. 257, 273 (1948)).

¶ 41. The right to a public trial "has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution." *In re Oliver,* 333 U.S. at 270. An open courtroom "is an effective restraint on possible abuse of judicial power" and a deterrent to arbitrary decision-making. *Id.* (footnote omitted).

¶ 42. This court indicated in *Ndina* that the Sixth Amendment right to a public trial advances four core values: "(1) to ensure a fair trial; (2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; (3) to encourage witnesses to come forward; and (4) to discourage perjury." *Ndina,* 315 Wis. 2d 653, ¶ 49 (quoting *Peterson v. Williams,* 85 F.3d 39, 43 (2d Cir. 1996) (citing *Waller,* 467 U.S. at 46–47)). However, the *Ndina* court noted that "[t]hese four values do not necessarily represent an exhaustive list of the values served by the Sixth Amendment right to a public trial." *Id.,* ¶ 49 n.25 (citing *Peterson,* 85 F.3d at 43 n.5).

¶ 43. The right to a public trial includes suppression hearings, *Waller,* 467 U.S. 39, and voir dire, *Presley,* 558 U.S. 209; *Press-Enterprise Co. v. Superior Court,* 464 U.S. 501 (1984) (The Court in *Press-Enterprise* relied on the First Amendment, not the Sixth Amendment, to support the public trial right for the press.).

¶ 44. Acknowledging the potential breadth of the right to a public trial, the fact remains that the right is not absolute. *Ndina,* 315 Wis. 2d 653, ¶ 44. The Supreme Court "has made clear that the right to an open

trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Waller,* 467 U.S. at 45. "There are no doubt circumstances where a judge could conclude that threats of improper communications with jurors or safety concerns are concrete enough to warrant closing *voir dire." Presley,* 558 U.S. at 215. "[T]he public-trial guarantee is not violated if an individual member of the public cannot gain admittance to a courtroom because there are no available seats. The guarantee will already have been met, for the 'public' will be present in the form of those persons who did gain admission." *Estes v. Texas,* 381 U.S. 532, 588–89 (1965) (Harlan, J., concurring).

¶ 45. To close a courtroom proceeding to the public in a criminal case without violating a defendant's public trial right, the circuit court must ensure that the following four requirements are satisfied: (1) the party advocating for closure "must advance an overriding interest that is likely to be prejudiced"; (2) the closure must be narrowly tailored to protect the overriding interest; (3) the judge must consider reasonable alternatives to excluding the public; and (4) the judge must make specific findings to support the exclusion of the public so that a reviewing court may assess whether the courtroom was properly closed. *Waller,* 467 U.S. at 45, 48.

¶ 46. In addition to qualifying the denial of the public trial right as described, the *Waller* Court also determined that "the remedy should be appropriate to the violation" to prevent defendants from taking advantage of the error. *See id.* at 50. In *Waller,* the trial court violated the defendant's right to a public trial when it

excluded the public from a suppression hearing over a period of seven days. *Id.* at 41–43. The Court ordered a new suppression hearing rather than a new trial because if a second suppression hearing ended in the same result as the first, "a new trial presumably would be a windfall for the defendant, and not in the public interest." *Id.* at 50 (citations omitted). Thus, even in the event of an improper courtroom closure, courts must carefully fashion a remedy to avoid granting a "windfall" to an opportunistic defendant.

¶ 47. Because the right to a public trial is not absolute, excluding the public from the courtroom will not always be error. When deprivation of the public trial right is an error, however, the Supreme Court has said that the error is structural—that it defies harmless error analysis. Thus, it is important to consider how excluding the public from voir dire fits within the framework of structural error.

## A. Structural Error

¶ 48. Both Pinno and Seaton contend that because violation of an accused's public trial right constitutes "structural error," the right cannot be forfeited—it must be waived. Consequently, they argue, any violation of the public trial right must be reviewed under a knowing, voluntary waiver standard.

¶ 49. Although "most constitutional errors can be harmless," there are a very limited number of structural errors that require automatic reversal. *Neder v. United States*, 527 U.S. 1, 8 (1999) (citation omitted). Structural errors are different from regular trial errors because they "are structural defects in the constitution of the trial mechanism, which defy analysis by

135

'harmless-error' standards." *Arizona v. Fulminante,* 499 U.S. 279, 309 (1991). Structural defects affect "[t]he entire conduct of the trial from beginning to end." *Id.* An error also may be structural because of the difficulty of determining how the error affected the trial. *United States v. Gonzalez-Lopez,* 548 U.S. 140, 149 n.4 (2006).

¶ 50. The limited class of structural errors include: complete denial of the right to counsel,[13] a biased judge,[14] excluding members of the defendant's race from a grand jury,[15] denial of the right to self-representation,[16] denial of the right to a public trial,[17] and a defective reasonable doubt instruction.[18] *Neder,* 527 U.S. at 8; *see also Gonzalez-Lopez,* 548 U.S. at 148–49, 152 (determining that violating a defendant's right to counsel of his choice is structural error). Because denial of the right to a public trial has been labeled a structural error, defendants generally do not have to show prejudice when they bring a properly preserved claim of violation. *See Waller,* 467 U.S. at 49–50 & n.9; *see also Neder,* 527 U.S. at 8 (citations omitted).

¶ 51. Although the Supreme Court has cited *Waller* in saying that the denial of the public trial right is structural error,[19] *Waller* itself did not use that term. The Court did not cite *Waller* or refer to denial of the

---

[13] *Gideon v. Wainwright,* 372 U.S. 335 (1963).

[14] *Tumey v. Ohio,* 273 U.S. 510 (1927).

[15] *Vasquez v. Hillery,* 474 U.S. 254 (1986).

[16] *McKaskle v. Wiggins,* 465 U.S. 168 (1984).

[17] *Waller v. Georgia,* 467 U.S. 39 (1984).

[18] *Sullivan v. Louisiana,* 508 U.S. 275 (1993).

[19] *See, e.g., United States v. Gonzalez-Lopez,* 548 U.S. 140, 148–49 (2006); *Neder v. United States,* 527 U.S. 1, 8 (1999); *Arizona v. Fulminante,* 499 U.S. 279, 310 (1991).

right to a public trial to illustrate structural defect until 1991. *Fulminante,* 499 U.S. at 310. Just two years later, the Court failed to mention *Waller* in *Sullivan v. Louisiana,* 508 U.S. 275 (1993), a Sixth Amendment case in which the Court stated that denying a criminal defendant's right to a verdict beyond a reasonable doubt was structural error. *Id.* at 281–82. Even more quizzical, the Supreme Court did not use the term "structural error" at all in *Presley,* a 2010 decision involving a deprivation of the public trial right during voir dire. *See Presley,* 558 U.S. 209. The *Presley* Court relied heavily on *Waller* but did not refer to the error as structural, perhaps realizing that such a label is somewhat dubious in comparison to the other errors that share the structural error designation.

¶ 52. The fact that *Waller* says the public trial right is not absolute and cautions that courts should impose a remedy that is appropriate to the violation undermines the "structural" nature of the error. Thus, we are left with a questionable proposition: excluding the public from the courtroom is structural error unless it is not error at all. We recognize the importance of maintaining and enforcing constitutional rights, but we have difficulty with a label—structural error—that equates the right to a completely open criminal trial with the right to an attorney or the right to an unbiased judge.

¶ 53. In any event, if the exclusions of the public during the voir dire proceedings in *Pinno* and *Seaton* were structural errors, that does not end the analysis. The Supreme Court's decision regarding the closure of voir dire in *Presley* provides a helpful factual comparison. In *Presley,* the judge told the defendant's uncle, who was the lone courtroom observer, that he had to leave the courtroom for the duration of voir dire. *Id.* at

137

210. The defendant's attorney objected to the judge's exclusion of the defendant's uncle, but the judge explained that the uncle could not "intermingle" with the jurors and that he could come back after voir dire. *Id.* The defendant moved for a new trial and offered evidence to show that the entire jury panel could fit in the jury box and on one side of the courtroom, leaving the other side open for the public. *Id.* at 210–11. The exclusion of the public in *Presley* was perhaps exacerbated by the fact that "[n]othing in the record show[ed] that the trial court could not have accommodated the public at Presley's trial." *Id.* at 215.

¶ 54. While there are similarities among *Presley* and the two cases before us, there is one crucial difference. In *Presley,* the defendant immediately objected to the closure. *Id.* at 210. Even granting that the violation of the right to a public trial is structural error, the Supreme Court has never said that the structural nature of that error exempts the defendant from an obligation to object to a violation. *See Freytag v. Comm'r,* 501 U.S. 868, 893 (1991) (Scalia, J., concurring) (expressing concern that the Court failed to determine whether a structural right may be forfeited by failure to object and opining that "structural constitutional claims[] have no special entitlement to review."). *Freytag* involved a different kind of structural defect—an alleged violation of the Appointments Clause and separation of powers—but Justice Scalia's analysis is persuasive as it pertains to the type of error in *Pinno* and *Seaton.* Justice Scalia commented:

> Personal rights that happen to bear upon governmental structure are no more laden with public interest (and hence inherently nonwaivable by the individual) than many other personal rights one can conceive of . . . for example, . . . the Sixth Amendment right to a trial that

138

is "public," provide[s] benefits to the entire society more important than many structural guarantees; but if the litigant does not assert [the right] in a timely fashion, he is foreclosed.

*Id.* at 895–96. (citations omitted).

¶ 55. To decide this case, we must turn now to whether the right to a public trial may be forfeited by the defendant's failure to object to a courtroom closure.

## B. Waiver and Forfeiture

¶ 56. We have recognized two distinct ways in which a defendant may give up his rights: waiver and forfeiture. "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *Ndina,* 315 Wis. 2d 653, ¶ 29 (quoting *United States v. Olano,* 507 U.S. 725, 733 (1993)). The forfeiture rule facilitates fair and orderly administration of justice and encourages parties to be vigilant lest they lose a right by failing to object to its denial. *Id.,* ¶ 30. Contemporaneous objections give judges the opportunity to remedy an error so that it does not fester beneath the proceedings and infect the judgment of the court. Forfeiture "prevents attorneys from 'sandbagging' opposing counsel by failing to object to an error for strategic reasons and later claiming that the error is grounds for reversal." *Id.* (footnote omitted).

¶ 57. In contrast, the waiver rule applies to rights that "are so important to a fair trial that courts have stated that the right is not lost unless the defendant knowingly relinquishes the right." *Id.,* ¶ 31. To decide whether a forfeiture or waiver analysis is appropriate,

139

"we look to the constitutional or statutory importance of the right, balanced against the procedural efficiency in requiring immediate final determination of the right." *State v. Soto,* 2012 WI 93, ¶ 38, 343 Wis. 2d 43, 817 N.W.2d 848. Rights that must be waived if they are to be lost include the right to assistance of counsel, the right to refrain from self-incrimination, the right to trial by jury, and the right of the defendant to be in the same courtroom as the presiding judge. *Id.,* ¶¶ 37, 40; *see State v. Huebner,* 2000 WI 59, ¶ 14, 235 Wis. 2d 486, 611 N.W.2d 727. This court has not yet determined whether the right to a public trial is subject to a waiver or forfeiture analysis; courts are divided on this issue. *Ndina,* 315 Wis. 2d 653, ¶ 35. We conclude that a criminal defendant may forfeit his right to a public trial when he knows of a court's order to exclude the public from the courtroom but fails to object.

¶ 58. We can think of at least four reasons to support this conclusion.

¶ 59. First, although the public trial right is very important, the absence of the public for part or even all of a criminal trial does not necessarily mean that the trial was unfair—that it did not serve its function as a reliable vehicle for the determination of guilt or innocence or that the punishment resulting from the trial was not legitimate. Juvenile proceedings are generally closed to the public, Wis. Stat. § 48.299, and many criminal hearings or even trials have no spectators to observe the proceedings. The presence of the public at a trial serves as a deterrent against misconduct or unfairness in the trial, but the absence of the public does not automatically lead to misconduct or unfairness or any other circumstance prejudicial to the defendant.

¶ 60. Second, a requirement that a defendant must waive his public trial right in order to lose it

would effectively supersede the circuit court's acknowledged authority to close the courtroom for compelling reasons by applying and satisfying the four *Waller* factors. The public trial right is not absolute. If a right is so important to a fair trial that the right cannot be lost unless the defendant intentionally waives it, then the right cannot be taken away by the court solely to advance another party's interests.

¶ 61. Third, the procedural efficiency in requiring objections to the denial of the public trial right favors a forfeiture analysis. *See Soto,* 343 Wis. 2d 43, ¶¶ 36–38. If waiver were required, a defendant could tax judicial resources by demanding a new trial if the judge excluded the public, even if the exclusion did not affect the proceedings. For his inaction, the defendant could receive a fair trial as well as an automatic reversal if he did not like the outcome. In such a scenario, waiver encourages gamesmanship. The new trial would be a "windfall" for the defendant, a result that the *Waller* Court explicitly tried to prevent. Balancing the importance of the public trial right and the efficiency of a contemporaneous determination of the right, it is evident that forfeiture is the proper analytical framework.

¶ 62. Fourth, using a forfeiture analysis in this context is supported by language in both *Waller* and *Presley.* The *Waller* Court concluded, "In sum, we hold that under the Sixth Amendment any closure of a suppression hearing *over the objections of the accused* must meet the tests set out in *Press-Enterprise* and its predecessors." *Waller,* 467 U.S. at 47 (emphasis added) (footnote omitted). Similarly, *Presley* said that "the accused does have a right *to insist* that the *voir dire* of the jurors be public . . . ." *Presley,* 558 U.S. at 213 (first emphasis added). Both cases use phrases suggesting that the onus is on the defendant to assert his right.

Thus, even though the denial of the public trial right has been deemed structural error, these cases use language that arguably promotes a forfeiture analysis.

¶ 63. Contrary to the contentions of Pinno and Seaton, the structural nature of the error in denying the right to a public trial does not command a waiver analysis. The Supreme Court has implied in dicta that a defendant may forfeit his right to a public trial. *See Peretz v. United States*, 501 U.S. 923, 936 (1991) (citing *Levine v. United States*, 362 U.S. 610, 619 (1960)), for the proposition that a defendant "waives" his right to a public trial by failing to object to courtroom closure). In *Levine*, the Court analyzed under the Due Process Clause the closure of the courtroom during a grand jury proceeding. *Levine*, 362 U.S. at 616. The Court said:

> Due regard generally for the public nature of the judicial process does not require disregard of the solid demands of the fair administration of justice in favor of a party who, at the appropriate time and acting under advice of counsel, saw no disregard of a right, but raises an abstract claim only as an afterthought on appeal.

*Id.* at 619–20. Although *Levine* was not decided on Sixth Amendment grounds, we find its reasoning persuasive here and decline to allow defendants who failed to object to the closure of a courtroom to raise that issue for the first time after the trial is over.[20] We conclude, therefore, that the Sixth Amendment right to a public

---

[20] We are not alone in determining that a defendant forfeits the right to a public trial by failing to object. *See, e.g., United States v. Christi*, 682 F.3d 138, 142–43 (1st Cir. 2012) (concluding that the defendant abandoned the right to a public trial by failing to object); *United States v. Hitt*, 473 F.3d 146, 155 (5th Cir. 2006), *cert. denied*, 549 U.S. 1360 (2007) (footnote omitted) (citations omitted) ("[R]egardless of whether the *Waller* prerequisites are met, defendants can waive their right to a public trial. . . . Where a defendant, with knowledge of the closure of

trial may be forfeited when a defendant knows that the judge has ordered the public to leave the courtroom but does not object.

### 1. Seaton's Voir Dire

¶ 64. Chronologically, Seaton's case was tried first, but Seaton's claim that his Sixth Amendment right to a public trial was violated did not come until nearly four years after the jury found him guilty.[21] It came via a Wis. Stat. § 974.06 motion,[22] which alleged that after the judge ordered the public out of the courtroom, courtroom personnel stood outside and prevented the public from reentering. Seaton argues that

---

the courtroom, fails to object, that defendant waives his right to a public trial."); *People v. Vaughn,* 821 N.W.2d 288, 308 (Mich. 2012) ("While a criminal defendant has the constitutional right to a public trial, that right is forfeited when no objection is made at the time of the courtroom's closure to members of the public."); *State v. Butterfield,* 784 P.2d 153, 157 (Utah 1989) ("We hold that the failure of a defendant and his or her counsel to object to a closure order constitutes waiver of the defendant's right to a public trial . . . ."). Although some of these cases use the term, "waiver," the context demonstrates that they are actually referring to what this court has deemed "forfeiture."

[21] Pinno, by contrast, argued in her Wis. Stat. § 974.02 motion on August 3, 2011, that the closing of voir dire violated her public trial right. Thus, Seaton's § 974.06 motion, filed on January 4, 2012, came after Pinno's motion.

[22] Wisconsin Stat. § 974.06(4) requires that the defendant provide a sufficient reason for raising an issue for the first time in a § 974.06 motion when that issue *"could have been raised* on direct appeal or in a sec. 974.02 motion." *State v. Escalona-Naranjo,* 185 Wis. 2d 168, 185, 517 N.W.2d 157 (1994). It is unclear why Seaton believes the denial of the public trial right could not have been raised in prior motions or on appeal. However, because the result that we reach has the same effect as determining his motion was procedurally barred, we will disregard the potential procedural defect for the purpose of our analysis.

Judge Nuss's order and the courtroom personnel guarding the doors constituted two separate violations of his right to a public trial. Judge Nuss did not hold an evidentiary hearing on Seaton's postconviction motion, so there was a lack of hard evidence to support his finding that the courtroom was never closed. However, the record is clear that Seaton did not object to any closure that may have occurred.

¶ 65. Seaton's argument that Judge Nuss's order and the bailiffs' blocking of the courtroom doors were two separate violations of his public trial right is unpersuasive. Seaton had an opportunity to object to the closure of the courtroom when Judge Nuss ordered the public to leave, and he did not take that opportunity. The bailiffs' actions were part of that same closure. This would be a different case if Judge Nuss had made no order closing the courtroom, and bailiffs, acting on their own and without notifying anyone in the courtroom, had prevented the public from entering. A defendant must have an opportunity to object to the closure if he is to forfeit his right to a public trial. *See Ndina,* 315 Wis. 2d 653, ¶ 135 (Prosser, J., concurring) (stating that a defendant must "enter a timely objection to a violation of the right [to a public trial] *unless the defendant is not in a position to do so*"). In this case, Seaton and his three attorneys were aware that the judge made an order excluding the public, and no one objected. Courtroom personnel did not create a separate closure if they acted to effect the court's order.

¶ 66. An evidentiary hearing is normally required if the § 974.06 motion alleges "sufficient facts that, if true, show that the defendant is entitled to relief." *Balliette,* 336 Wis. 2d 358, ¶ 18 (citation omitted).

144

Nothing in Seaton's § 974.06 motion suggests that he objected to the courtroom closure. Therefore, Seaton forfeited his right to a public voir dire, and the circuit court did not erroneously exercise its discretion in denying the § 974.06 motion without a hearing.

### 2. Pinno's Voir Dire

¶ 67. In Pinno's trial, Judge Nuss said, "[O]nce we start voir dire there won't be anybody coming in and out of here until after the jury is selected." No one objected to Judge Nuss's statement. Twenty-five pages later in the transcript, Judge Nuss reiterated that the courtroom would be closed: "Other than the jury, nobody will be in the courtroom."[23] He made the second announcement before the court and parties took a short break, and no one objected. On more than one occasion, Judge Nuss asked counsel if they had any motions, but the attorneys consistently responded that they did not.

██

¶ 68. Pinno argued in a Wis. Stat. § 974.02 motion after trial that her right to a public trial was denied, and Judge Nuss held an evidentiary hearing. At that

---

[23] For the purpose of our analysis for both cases, we will assume that if the voir dire proceedings were closed, the closures were not trivial. In both cases, the State argues that the Sixth Amendment was not implicated because of the trivial nature of the closure. We have determined that a closure may be trivial "if the closure 'does not implicate the values served by the Sixth Amendment.'" *State v. Ndina*, 2009 WI 21, ¶ 49, 315 Wis. 2d 653, 761 N.W.2d 612 (quoting *United States v. Perry*, 479 F.3d 885, 890 (D.C. Cir. 2007)). In *Ndina* we noted that it would be rare that exclusion of the defendant's friends and family would be trivial. *Id.*, ¶¶ 51–52. Since the allegations are that Judge Nuss closed voir dire for the duration of that proceeding, we will assume that these cases do not present the rare circumstances in which the closure is trivial.

hearing, Judge Nuss's clerk at the time said that the courtroom was not locked and that people came in and out during voir dire. Pinno's trial counsel said that because the judge did not address the issue again when they all came back from break, she did not feel the need to address it. After hearing the evidence, Judge Nuss determined that the courtroom was never closed and denied the postconviction motion. Based on the evidence at the hearing, Judge Nuss's finding that the courtroom was never closed is not clearly erroneous. Even if the finding were erroneous, Pinno failed to object to any closure that took place. Therefore, even if the courtroom was closed, Pinno forfeited her Sixth Amendment right to a public trial.

### 3. The Obligations of Circuit Courts

¶ 69. Despite our conclusion that Seaton and Pinno forfeited their rights to a public trial by failing to object to the exclusion of some members of the public, we pause to reflect on the circuit court's handling of voir dire. We do not doubt that the court had good intentions, but the court's good intentions cannot hide its seriously mistaken approach in the two cases.

¶ 70. The Sixth Amendment affords an accused criminal defendant the right to a public trial. This right has deep historical roots. The news media and the public have an overlapping right that is guaranteed by the First Amendment. These rights are buttressed by the Wisconsin Constitution and state statutes. They may not be diminished without very careful consideration that is detailed on the record.

¶ 71. In these jury cases, the court was faced with large jury panels that would take up most of the seating space in the courtroom. It was not unreasonable for the

court to try to accommodate the seating and comfort of the jury panel. It was not unreasonable to try to avoid any undue influence on the panel or disruption of the jury selection process. It was not unreasonable to think about a defendant's interests in a case with sensational pretrial publicity. What is troublesome here is the court's failure to appreciate that it could not act alone in addressing these concerns.

¶ 72. When a party moves to close a courtroom in whole or in part, the court is accustomed to requiring the moving party to explain and justify the "overriding interest" that warrants this "rare" action by the court. The movant has the burden of showing why its identified interest will be prejudiced by a public trial. The closure must be tailored to protect that interest, alternatives to closure must be considered, and judicial findings sufficient to support the closure must be made.

¶ 73. These requirements are not dispensed with when the court itself initiates the closure. The court must consult with the parties, one of whom has a constitutional right to a public trial and one of whom has the dual responsibility of promoting the public interest in openness and protecting the record to avoid reversible error.

¶ 74. Here the court did not protect the record. The transcript suggests that the court made up its mind to close the courtroom without explaining the situation fully or soliciting the input of affected interests. This flawed approach precluded a "tailored" solution or an alternative to closure or negotiated accommodations. This approach discouraged collaboration. This approach did not result in satisfactory findings for the record. The court's approach may have created disgruntlement on the part of people visiting the court, and it certainly fostered these appeals.

¶ 75. When a court intends to close the courtroom to the public for any reason, it should go through the four *Waller* factors. Possible alternatives to closure include "reserving one or more rows for the public; dividing the jury venire panel to reduce courtroom congestion; or instructing prospective jurors not to engage or interact with audience members." *See Presley,* 558 U.S. at 215.

¶ 76. Judges should also be cognizant of Wis. Stat. § 757.14 and should follow this court's guidance:

> The trial judge should recite on the record the factors that impel him to close the courtroom and why such factors override the presumptive value of a public trial. The findings of fact must be made with specificity. The process must be a rational one, and the rationality of it must be demonstrated on the record, showing that the conclusion was reached on facts of record or which are reasonably derived by inference from the record. Upon review an appellate court should be able to determine from the record whether discretion was in fact exercised and whether a reasonable judicial mind could have reached the conclusion it did. A trial court is required to hold a hearing and publicly reach a conclusion based on the exercise of discretion prior to ordering a closing. The parties, and members of the public present in court, may appear at such hearing.

*State ex rel. La Crosse Tribune v. Circuit Court for La Crosse Cnty.,* 115 Wis. 2d 220, 236–37, 340 N.W.2d 460 (1983). "We agree with Professor LaFave that '[g]enerally, the best course of action is for the trial judge to hold an evidentiary hearing on the issue of closure' when an order of the trial court implicates the Sixth Amendment right to a public trial." *Ndina,* 315 Wis. 2d 653, ¶ 63 (brackets in original) (quoting 6 Wayne R. LaFave et al., *Criminal Procedure* § 24.1(b), at 304 (3d ed. 2007)).

¶ 77. Whenever a judge wants to close the courtroom, the judge should engage in a discussion with defense counsel and should consider the concerns and preferences of the defendant. The judge should ask if the defendant has any family or friends in attendance. If there is a victim, the same question should be asked of the state regarding the victim and the victim's family. The judge should make an effort to seat the victim and the victim's family away from the defendant's family. The judge should make an effort to seat members of the public away from the jury panel and should instruct the public and the potential jurors that they are not to communicate with each other during voir dire. The judge should determine the presence of any members of the press and try to accommodate their interests even if they are late.

¶ 78. Fairness is essential to our system of justice. This fairness should be a pride of every court. It is hard to demonstrate this fairness if the courtroom is closed—if citizens who have done nothing wrong are shooed away. A judge should respect the importance of the duty to facilitate justice at every stage of the proceeding and should exercise great care that no rights are violated.

¶ 79. "Both the prosecutor and defense counsel should bring the Sixth Amendment right to a public trial to the circuit court's attention and should assist the circuit court in crafting a closure order consistent with the Sixth Amendment's 'basic tenet of our judicial system.'" *Ndina,* 315 Wis. 2d 653, ¶ 85 (quoting *State v. Vanness,* 2007 WI App 195, ¶ 8, 304 Wis. 2d 692, 738 N.W.2d 154).

¶ 80. Adopting the forfeiture rule here does not give judges carte blanche to order courtroom closures when defendants are inattentive. Rights that can be forfeited are still rights, and judges and attorneys should strive to conduct trials in the fairest manner possible. We hope that this opinion clarifies the proper procedure for closing a trial proceeding so that judges may act to protect the rights of defendants and the public and to facilitate the orderly administration of justice.

### C. Ineffective Assistance of Counsel

¶ 81. Having determined that Pinno and Seaton forfeited their rights to a public trial, we turn now to the claims of ineffective assistance of counsel. To raise a claim of ineffective assistance of counsel, "a defendant must show both (1) that his counsel's representation was deficient and (2) that this deficiency prejudiced him so that there is a 'probability sufficient to undermine the confidence in the outcome' of the case." *State v. Erickson,* 227 Wis. 2d 758, 768, 596 N.W.2d 749 (1999) (citing *Strickland v. Washington,* 466 U.S. 668, 694 (1984); *State v. Johnson,* 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990)).

¶ 82. To demonstrate deficient performance, a defendant must show that "counsel's representation fell below an objective standard of reasonableness." *State v. Franklin,* 2001 WI 104, ¶ 13, 245 Wis. 2d 582, 629 N.W.2d 289 (quoting *Strickland,* 466 U.S. at 688). To demonstrate prejudice, the defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.,* ¶ 14 (quoting *Strickland,* 466 U.S. at 687). Thus, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different."
*Id.* (quoting *Strickland,* 466 U.S. at 694) (brackets in
original). In conducting this analysis, courts should
presume that the attorney has "rendered adequate
assistance and made all significant decisions in the
exercise of reasonable professional judgment." *Strick-
land,* 466 U.S. at 690.

¶ 83. Pinno and Seaton both argue that because
the right to a public trial is structural, prejudice must be
presumed when counsel fails to object to a closure.
However, the circumstances in which prejudice is pre-
sumed are rare. We presume prejudice: (1) "when the
effective assistance of counsel has been eviscerated by
forces unrelated to the actual performance of the
defendant's attorney," such as when counsel is denied
entirely during critical stages in judicial proceedings;
(2) when the circumstances are such that even a compe-
tent attorney could not provide effective assistance, such
as when the state or the court interferes with counsel's
representation; and (3) when the attorney engages in
egregious conduct far outside the bounds of effective
assistance such as providing representation under a
conflict of interest or failing to present known evidence
that calls into question the defendant's competency to
stand trial. *Erickson,* 227 Wis. 2d at 769–71 (citations
omitted); *see Bell v. Cone,* 535 U.S. 685, 695–98 (2002);
*Strickland,* 466 U.S. at 692–93; *United States v. Cronic,*
466 U.S. 648, 659–60 (1984).

¶ 84. This court also has presumed prejudice when
defense counsel failed to object when the prosecutor
materially breached a plea agreement with respect to
sentencing by recommending prison time instead of
remaining silent as agreed. *State v. Smith,* 207 Wis. 2d
258, 280–81, 558 N.W.2d 379 (1997). In deciding to

presume prejudice, we noted that "[p]art of the rationale behind presuming prejudice is the difficulty in measuring the harm caused by the error or the ineffective assistance." *Id.* at 280 (citations omitted). However, *Smith* was different from the present case because when a prosecutor agrees not to make a sentence recommendation and breaches that agreement, the breach "is a 'manifest injustice' and always results in prejudice to the defendant." *Id.* at 281 (footnote omitted) (citation omitted). We cannot say the same for a denial of the public trial right during voir dire, which does not necessarily implicate manifest injustice concerns that exist in the plea context.

¶ 85. We declined to extend the presumption of prejudice in *Smith* to a failure to object to a six-person jury in a misdemeanor case. *See Franklin,* 245 Wis. 2d 582, ¶ 10. Even though it is difficult to assess the harm from a six-person jury as opposed to a twelve-person jury, we determined that "six-person juries do not invoke interests of justice factors which require an automatic finding of prejudice." *Id.,* ¶ 23. Moreover, when the case does not fall into one of the three categories in which prejudice is presumed, there is prejudice only when counsel's errors deprive the defendant of a fair trial. *Id.,* ¶ 24. Because the denial of a twelve-person jury does not fit within the three categories in which we presume prejudice, no prejudice was presumed. *Id.,* ¶¶ 25–26. We reach the same conclusion regarding the denial of the right to a public voir dire.

¶ 86. Given that prejudice is rarely presumed, an error does not automatically receive a presumption of prejudice merely because it is deemed structural.[24]

---

[24] *See Purvis v. Crosby,* 451 F.3d 734, 743 (11th Cir. 2006). In *Purvis,* the court said:

Indeed, a rule that prejudice must be presumed when counsel fails to object to the exclusion of the public would effectively nullify the forfeiture rule. It would not matter that the defendant failed to object because he could demand a reversal on appeal based on ineffective assistance if he could prove his counsel was deficient. As discussed above, the denial of the right to a public trial does not always lead to unfairness or prejudice. "Thus, only when surrounding circumstances justify a presumption of ineffectiveness can a Sixth Amendment claim be sufficient without inquiry into counsel's actual performance at trial." *Cronic*, 466 U.S. at 662 (footnote omitted). Structural errors, generally, do not fall under one of those circumstances.[25]

### 1. Seaton's Ineffective Assistance Claim

¶ 87. Seaton argues in his Wis. Stat. § 974.06 postconviction motion that his trial counsel was ineffective. However, Seaton's motion does not allege sufficient facts to entitle him to an evidentiary hearing. Seaton makes the conclusory argument that "[a]ny failure to object was likely based on oversight or inat-

---

For the same reasons that prejudice cannot be presumed in order to satisfy the prejudice requirement when an objection to structural error was not made at trial, it cannot be presumed to satisfy the prejudice component of an ineffective assistance claim arising from the same failure to preserve the structural error.

*Id.*

[25] Contrary to the assertions of both defendants, declining to presume prejudice when an attorney fails to object to the violation of the right to a public trial does not necessarily leave defendants without a remedy. Defendants could potentially seek relief under the discretionary reversal statutes if the error involved a miscarriage of justice. Wis. Stat. §§ 751.06 and 752.35.

tention, rather than any reasoned defense strategy and thus constitutes deficient performance." That argument hardly overcomes the presumption of adequate representation. Moreover, as the State points out, counsel had a number of reasons for not objecting. Seaton's attorneys might have concluded that it would be better not to have the public sitting with jurors during voir dire for a homicide trial.[26] Seaton's attorneys may have determined that it was better not to delay matters[27] and expend resources on a hearing to determine whether closure was warranted. Thus, Seaton has failed to demonstrate that his counsel's failure to object to the exclusion of the public was objectively unreasonable.

[26] Although it is clear that the danger of improper discussions between the public and jurors is not a proper basis for a *judge* to close voir dire, *Presley,* 558 U.S. at 215, that does not necessarily mean that it is unreasonable for *counsel* and even the defendant to prefer a private proceeding. It is important not to conflate the analysis of public trial violation claims and claims of ineffective assistance of counsel relating to the same. *See, e.g., Horton v. Allen,* 370 F.3d 75, 82–83 (1st Cir. 2004) (noting that there are strategic advantages to a private voir dire even though a defendant has the right to insist on a public proceeding, and defense counsel's decision to agree to closed voir dire was objectively reasonable); *Vaughn,* 821 N.W.2d at 306 (suggesting that it may be reasonable for counsel to determine that a closed voir dire will facilitate honest answers from prospective jurors).

[27] *See State v. Small,* 2013 WI App 117, ¶ 10, 351 Wis. 2d 46, 839 N.W.2d 160. In *Small,* the defendant's attorney initially objected to the exclusion of an observer who allegedly threatened a witness. *Id.* The court then prudently offered, "I'll interrupt this trial at 1:30 and we'll take testimony . . . ." *Id.* The lawyer responded, "We don't want a delay in the trial." *Id.* The court determined that the defendant failed to show that he was prejudiced by his counsel's conduct without discussing whether the performance was deficient, *id.,* ¶ 12, but it seems unlikely that the defendant would have been able to show that his attorney was deficient for deciding not to interrupt the trial.

¶ 88. Even if Seaton's counsel had been deficient for failing to object, Seaton has not demonstrated that he was prejudiced by his counsel's alleged deficiency. In his § 974.06 motion, Seaton merely alleged that his counsel's failure to object deprived him of his right to a public trial and that the denial of the right to a public trial is not subject to a harmless error analysis. However, it is not enough to say that counsel failed to object to the denial of a right that would lead to structural error. The defendant must either demonstrate that the error falls within the rare circumstances in which we presume prejudice or he must prove that there was actual prejudice. Seaton has done neither. Thus, Seaton has failed to allege sufficient facts in his § 974.06 motion that, if true, would entitle him to relief, and the circuit court did not erroneously exercise its discretion in denying the motion without a hearing.

### 2. Pinno's Ineffective Assistance Claim

¶ 89. Pinno argues that because the judge's exclusion of the public deprived her of her Sixth Amendment right, her counsel's failure to object was unreasonable and therefore constituted deficient performance. She asserts that the failure to object was likely due to oversight or inattention. However, these arguments find little support.

¶ 90. At the postconviction motion hearing, Attorney Block said that she did not object to the exclusion of the public for several reasons. She said that the court made that order before the court took a break, and there was no indication that the courtroom was closed when they came back, so there was no need to object. Attorney Block also said that public voir dire could have potentially had a negative effect on the jury, probably because of the inflammatory nature of the publicity

155

surrounding the trial. The District Attorney said that he would not "fault Ms. Block too much for not interrupting the Court." Attorney Block's decision not to object to Judge Nuss's order closing the courtroom was not objectively unreasonable. Therefore, Pinno has failed to prove that her counsel was deficient.

¶ 91. Even assuming Attorney Block's performance was deficient, Pinno has not proven any prejudice. Pinno merely argues that her attorney's failure to object should not be subject to a harmless error analysis and argues that prejudice should be presumed. However, harmless error and prejudice are different inquiries. A presumption of harm from an error to which counsel objected does not compel a presumption of prejudice when counsel fails to object.[28] The Supreme Court did not include structural errors in the limited set of circumstances in which ineffective assistance is presumed to prejudice the defendant, and neither has this court. Therefore, since Pinno has made no showing of prejudice, we conclude that she did not receive ineffective assistance of counsel.

## D. Seaton's Recusal Motion

¶ 92. "A fair trial in a fair tribunal is a basic requirement of due process." *State v. Carprue,* 2004 WI

---

[28] The presumption of harm granted to a structural error to which counsel objects gives the defendant and counsel incentive to timely assert a right by objecting to its denial. However, when a defendant benefits from forfeiting a right, such as when voir dire is private in a highly publicized and controversial case, it would be unreasonable, absent some proof, to afford the defendant a presumption that his attorney's failure to object resulted in prejudice.

111, ¶ 59, 274 Wis. 2d 656, 683 N.W.2d 31 (quoting *In re Murchison,* 349 U.S. 133, 136 (1955)). When considering a claim of judicial bias, the reviewing court presumes that the judge was unbiased. *State v. Gudgeon,* 2006 WI App 143, ¶ 20, 295 Wis. 2d 189, 720 N.W.2d 114. However, that presumption of impartiality is rebuttable. *Id.* It is important to note that judges often consider post-conviction motions relating to proceedings over which they presided. *Cf., State v. Henley,* 2010 WI 97, ¶ 3, 328 Wis. 2d 544, 787 N.W.2d 350; *State v. Boyden,* 2012 WI App 38, ¶ 10, 340 Wis. 2d 155, 814 N.W.2d 505; *State v. Prescott,* 2012 WI App 136, ¶ 7 n.1, 345 Wis. 2d 313, 825 N.W.2d 515. The fact that a judge presided over a trial does not mean that the judge may not preside over subsequent postconviction proceedings.

¶ 93. The relevant recusal standard in the Wisconsin Statutes is a subjective one. A judge must recuse himself if he "determines that, for any reason, he . . . cannot, or it appears he . . . cannot, act in an impartial manner." Wis. Stat. § 757.19(2)(g). This statute "is clearly drafted so as to place the determination of partiality solely upon the judge." *State v. Harrell,* 199 Wis. 2d 654, 664, 546 N.W.2d 115 (1996) (citing *State v. Am. TV and Appliance of Madison, Inc.,* 151 Wis. 2d 175, 182–83, 443 N.W.2d 662 (1989)); *see State v. Rochelt,* 165 Wis. 2d 373, 379, 477 N.W.2d 659 (Ct. App. 1991) ("The trial judge's declaration that he was not biased satisfies the subjective test."). A reviewing court decides objectively whether the judge actually made the subjective determination. *Harrell,* 199 Wis. 2d at 664. In this case, Judge Nuss said, "I take great pride in my impartiality . . . . I don't think at any time in the Seaton case [have] my standards with regard to that ever wandered." Later on, Judge Nuss explicitly considered the subjective bias test:

157

> The subjective test is one that I just do internally, whether or not there has been something presented that has polarized me to a point where either the State or the defendant's rights in further proceedings are in any way compromised because of preconceived opinions that this Court may have with regard to subsequent decisions. Well, I can assure both sides that that never presented itself in this case, to this day it doesn't. *I maintain I'm extremely fair and impartial.*

(Emphasis added.) Judge Nuss determined that he was not biased; therefore, he complied with Wis. Stat. § 757.19(2)(g).

¶ 94. In addition to the requirement that a judge must reach a subjective determination that he is not biased under Wis. Stat. § 757.19(2)(g), the Due Process Clause requires an objective inquiry. *Caperton v. A.T. Massey Coal Co.,* 556 U.S. 868, 884, 886–87 (2009) (contribution of roughly $3 million to judge's campaign from a person with a personal stake in the case created "serious risk of actual bias" that rose to an unconstitutional level). However, "The Due Process Clause demarks only the outer boundaries of judicial disqualifications." *Id.* at 889 (quoting *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 828 (1986)). "[M]ost matters relating to judicial disqualification [do] not rise to a constitutional level." *Id.* at 876 (brackets in original) (quoting *FTC v. Cement Inst.,* 333 U.S. 683, 702 (1948)). "Because the codes of judicial conduct provide more protection than due process requires, most disputes over disqualification will be resolved without resort to the Constitution." *Id.* at 890. Judge Nuss's conduct does not approach the extreme circumstances that violate due process. Thus, we turn to the Wisconsin Supreme Court Rules (SCR) to analyze Seaton's recusal claim.

¶ 95. Seaton quotes SCR 60.04(4)(a) to support the argument that Judge Nuss was biased. That rule says that a judge must recuse himself if, "[t]he judge has a personal bias or prejudice concerning a party or a party's lawyer or personal knowledge of disputed evidentiary facts concerning the proceeding." SCR 60.04(4)(a). Notably, the comment for SCR 60.04(4)(a) says that "bias or prejudice requiring recusal most often arises from a prior personal relationship but may arise from strong personal feelings about the alleged conduct of a party." The comment suggests that bias under SCR 60.04(4)(a) generally comes from an extrajudicial source. However, there is no indication that Judge Nuss had a personal bias or prejudice for or against anyone in Seaton's case. There is no evidence to suggest that Judge Nuss had a personal relationship with any party or that he had strong personal feelings about anyone's conduct. Therefore, recusal was not required under SCR 60.04(4)(a).

¶ 96. More generally, SCR 60.04(4) says:

[A] judge shall recuse himself or herself in a proceeding when the facts and circumstances the judge knows or reasonably should know establish one of the following or when reasonable, well-informed persons knowledgeable about judicial ethics standards and the justice system and aware of the facts and circumstances the judge knows or reasonably should know would reasonably question the judge's ability to be impartial[.]

SCR 60.04(4). None of SCR 60.04(4)'s enumerated circumstances fits the facts of this case. The comment to SCR 60.04(4) gives an example of a judge who is seeking employment from a law firm; such a judge must recuse himself from cases in which that law firm would appear. The comment also references Wis. Stat. § 757.19 as setting forth circumstances when the judge must dis-

qualify himself. The comment demonstrates that the Supreme Court Rules, like Wis. Stat. § 757.19, require recusal in fairly obvious scenarios in which a judge is clearly in an ethical quagmire. *Seaton* is not such a case.

¶ 97. In Seaton's case, Judge Nuss was careful to foster the appearance of impartiality. In response to Kirkpatrick's letters to him, Judge Nuss denied an interview request "in order to insure that the integrity of the official court file and record are preserved" and noted that the Code of Judicial Ethics and Supreme Court Rules prohibited him from granting the interview request. Judge Nuss's response shows that he took care to avoid appearing partial. Although Judge Nuss did state that "at no time was either[] party's right to a public trial compromised during either the jury selection process or at any other time," that comment did not rise to the level of an appearance of bias, nor was that comment enough to overcome the presumption of impartiality. Therefore, Judge Nuss properly denied Seaton's recusal motion.

## IV. CONCLUSIONS

¶ 98. We reach the following conclusions.

¶ 99. First, the Sixth Amendment right to a public trial extends to voir dire. *Presley,* 558 U.S. at 213. A judge's decision to "close" or limit public access to a courtroom in a criminal case requires the court to go through an analysis on the record in which the court considers overriding interests and reasonable alternatives as set out in *Waller,* 467 U.S. at 45, 48. The court must make specific findings on the record to support the exclusion of the public and must narrowly tailor the closure. *Id.*

¶ 100. Second, the Sixth Amendment right to a public trial may be asserted by the defendant at any time during a trial. A defendant who fails to object to a judicial decision to close the courtroom forfeits the right to a public trial, so long as the defendant is aware that the judge has excluded the public from the courtroom. Although the Supreme Court has categorized a violation of the right to a public trial as a structural error, that categorization does not mandate a waiver analysis, and a defendant need not affirmatively relinquish his right to a public trial in order to lose it. It would be inimical to an efficient judicial system if a defendant could sit on his hands and try his luck in a closed courtroom only to argue after his conviction that his Sixth Amendment right to a public trial had been violated.

¶ 101. Third, the records in these cases are clear that neither Seaton nor Pinno objected to the alleged courtroom closure. In Seaton's case, the allegation that courtroom personnel prevented the public from reentering the courtroom does not alter the analysis because Seaton was aware of the initial exclusion. If courtroom personnel did prevent the public from coming back into the courtroom, that prevention was part of the initial exclusion. Therefore, Seaton and Pinno both forfeited their rights to a public trial.

¶ 102. Fourth, defendants must demonstrate prejudice to prove ineffective assistance of counsel when counsel fails to object to the closure of the courtroom. The categorization of the denial of the public trial right as structural error does not create a presumption of prejudice in ineffective assistance of counsel claims. Seaton and Pinno have not proven that they were prejudiced by their attorneys' failure to object to the

161

exclusion of the public from the courtroom. Therefore, both defendants have failed to prove that their counsel was ineffective.

¶ 103. Finally, Seaton was not denied his right to an impartial judge. Judge Nuss's communications show that he was cognizant of his responsibilities under the Judicial Code of Conduct, and he did not appear to be biased. We presume that judges are impartial, and Seaton has not offered sufficient evidence to rebut that presumption. Therefore, Judge Nuss properly denied the recusal motion.

*By the Court.*—The judgment and order of the circuit court are affirmed.

¶ 104. SHIRLEY S. ABRAHAMSON, C.J. *(dissenting)*. I join the reasoning set forth in Justice N. Patrick Crooks' dissent, which focuses on the defendant's Sixth Amendment right to a public trial.

¶ 105. I write separately to focus on the violations in the instant cases of the public's right to open court proceedings, a right with deep historical roots in the First Amendment to the United States Constitution, in Wisconsin statutes dating back to 1849, and in the common law. Even if the *defendant* voluntarily and knowingly agrees to a closure, the *public* retains a right to open judicial proceedings. The public's right cannot be waived by the defendant. Rather, the public's right is an obligation that the court must enforce *sua sponte.*

¶ 106. The news media and the public have rights to open court proceedings, "guaranteed by the First Amendment . . . [and] buttressed by the Wisconsin Constitution and state statutes. They may not be diminished without a court's very careful consideration that is detailed on the record."[1]

---

[1] Majority op., ¶ 70.

¶ 107. The majority opinion is filled with soaring rhetoric deploring closed court proceedings and with solemn, sober admonitions to circuit courts about the procedures to be followed before closing a proceeding to the public. The majority opinion fittingly declares that in the present cases, the circuit court's "good intentions cannot hide its seriously mistaken approach in the two cases" and goes on to chastise the circuit court as follows:

> What is troublesome here is the court's failure to appreciate that it could not act alone in addressing these concerns.
>
> . . . .
>
> The closure must be tailored . . ., alternatives to closure must be considered, and judicial findings sufficient to support the closure must be made.
>
> . . . .
>
> The transcript suggests that the court made up its mind to close the courtroom without explaining the situation fully or soliciting the input of affected interests.[2]

¶ 108. The majority opinion concedes that the closures in the instant cases were improper. It accepts that closures have been characterized as structural error,[3] *i.e.,* an error subject to automatic reversal, an error that "infect[s] the entire trial process and necessarily render[s] a trial fundamentally unfair."[4]

¶ 109. Yet the majority opinion renders the lofty legal tenets meaningless as it empowers circuit courts

---

[2] Majority op., ¶¶ 69, 71, 72, 74.

[3] Majority op., ¶¶ 49–50 (citing *Waller v. Georgia,* 467 U.S. 39 (1984); *United States v. Gonzalez-Lopez,* 548 U.S. 140, 148–49 (2006); *Neder v. United States,* 527 U.S. 1, 8 (1999); *Arizona v. Fulminante,* 499 U.S. 279, 294 (1991)).

[4] *State v. Ford,* 2007 WI 138, ¶ 42, 306 Wis. 2d 1, 742 N.W.2d 61 (quoting *Neder,* 527 U.S. at 8).

to close courtrooms to the public without any compelling reason and offers no remedy for the circuit court's violations of the public's right to open court proceedings.

¶ 110. The judiciary must enforce the fundamental right of the public to open court proceedings.

¶ 111. Rather than enforce the public's right, the majority simply throws up its collective hands and sends a jarring message: This court will not honor the legal commandments of the United States and Wisconsin Constitutions, the statutes, and the common law.

¶ 112. The majority opinion asserts that "it would seem odd to allow a reversal of a judgment based on the demand of a member of the public." Majority op., ¶ 40 n.12. But the majority opinion does not explain what is "odd" about this court's enforcement of constitutional, statutory, and common-law mandates that court proceedings be open.

¶ 113. Unlike the majority opinion, I do not view enforcement of public rights to open court proceedings as "inimical to an efficient judicial system." Majority op., ¶ 7. I view enforcement of the public right to open judicial proceedings as essential to an accountable judiciary deserving of the public's trust and confidence in the fair administration of justice. "It is hard to demonstrate . . . fairness if the court is closed."[5]

¶ 114. The issue is what is the remedy in the present case for the violation. Different facts and circumstances dictate different remedies.[6] The record demonstrates that closing courtrooms in Fond du Lac

---

[5] Majority op., ¶ 78.

[6] Although in some cases of erroneous court closures a remedy of disclosure of the transcript may be appropriate, *see* *State ex rel. La Crosse Tribune v. Circuit Court,* 115 Wis. 2d 220, 242, 340 N.W.2d 460 (1983), in other cases, a different remedy

County during voir dire without a compelling justification is a repeated practice.[7] Consequently, in the instant cases, the remedy for the repeated violations of the

may be appropriate. *See Waller*, 467 U.S. at 50 (determining that "the remedy should be appropriate to the violation").

This court has recognized that the appropriate remedy is one that conforms to the particular facts and circumstances of the case. *Cf. State v. Deilke*, 2004 WI 104, ¶ 25, 274 Wis. 2d 595, 682 N.W.2d 945 (summarizing our case law as basing the appropriate remedy for material and substantial breach of a plea agreement on the totality of the circumstances); *Summers v. Touchpoint Health Plan, Inc.*, 2008 WI 45, ¶¶ 44–47, 309 Wis. 2d 78, 749 N.W.2d 182 (selecting appropriate remedy in wrongful termination case to "return to the status quo prior to the arbitrary and capricious termination actions"); *State v. Beyer*, 2006 WI 2, ¶¶ 48–62, 287 Wis. 2d 1, 707 N.W.2d 509 (considering the appropriate remedy in a due process violation during civil commitment proceedings based on the purposes of the statute, the nature of the error, and the ability of the remedy to correct the error).

[7] A deputy at the courthouse, Michael Hardengrove, asserted that closure of the courtroom was a repeated event for voir dire:

Q: Based on your experience working as courthouse security, do you recall times when a courtroom may have been cleared to make room for potential jurors?

A: Yes. That has been done in the past when the jury pool is large and the courtroom is not big enough to hold everyone.

Q: What happens in those cases in which the jury pool is large?

A: The jury pool gets priority over other people. I have known of situations in which the jury pool was so large that the questioning began in the basement of the courthouse before moving to the courtroom.

Q: So at the time of Mr. Seaton's trial, it wasn't unusual for the courtroom to be emptied to make sure there was enough room for the jury panel?

A: No, it wasn't unusual.

*See* majority op., ¶ 19 n.7; J. Crooks' dissent, ¶ 147 & n.1.

constitutions, Wis. Stat. § 757.14, and the common law public trial right must be to reverse the judgments of the circuit court and remand the causes to the circuit court for new trials. The recurring illegal practice of closing voir dire in Fond du Lac County must end. It is the responsibility of the trial and appellate courts of the State to keep judicial proceedings public and open:

> [T]he great virtue in our Anglo-American court system is that it is open to the public so that all will know that the courts, as instruments of government, are defending the rights of the people and are not suppressing them. Thus it will be rare indeed when a trial judge can appropriately and in the exercise of discretion conclude that the quest for justice will be better served by secrecy than by public disclosure.[8]

¶ 115. The two cases before the court are not rare cases justifying closed courtrooms. It is this court's task to protect the public's right to open court proceedings. Accordingly, I dissent.

I

¶ 116. Our forebears thought the public right to open court proceedings so important that they firmly embedded and protected the right in three vital legal sources: The United States and Wisconsin Constitutions, the Wisconsin statutes dating back to 1849, and the common law.

¶ 117. The United States Constitution and Wisconsin Constitution guarantee the right of the public to attend trials. The right of the public to attend trials under the First Amendment has been recognized as

---

[8] *La Crosse Tribune,* 115 Wis. 2d at 242.

protecting distinctly public rights, notwithstanding the interests of criminal defendants under the Sixth Amendment.[9]

¶ 118. The right to attend public trials "is implicit in the guarantees of the First Amendment; without the freedom to attend such trials, which people have exercised for centuries, important aspects of freedom of speech and of the press would be eviscerated."[10]

¶ 119. The public's constitutional right to public access to a trial plays a particularly significant role in the proper functioning of the judicial process and the government as a whole.[11] Public scrutiny serves as "an effective restraint on possible abuse of judicial power."[12]

¶ 120. Indeed, the United States Supreme Court has recognized that any deprivation of the public right

---

[9] Notably, for example, in *Press-Enterprise Co. v. Superior Court (Press-Enterprise I)*, 464 U.S. 501, 504 (1984), the defendant favored closure, arguing that failure to seal certain records would "violate the jurors' right to privacy." Nonetheless, the United States Supreme Court held that the public right to open trials required enforcement.

[10] *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 580 (1980) (Burger, C.J., joined by White, J. & Stevens, J.) (internal quotation marks & citation omitted); *see also Richmond Newspapers,* 448 U.S. at 592 (Brennan, J., concurring in the judgment, joined by Marshall, J.) ("[O]pen trials are bulwarks of our free and democratic government: public access to court proceedings is one of the numerous 'checks and balances' of our system, because contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.") (internal quotation marks and citations omitted).

[11] In *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 606 (1982), the Court held, *inter alia,* that to justify exclusion of the press and public from criminal trials, the state must show that closure is necessitated by a compelling government interest and is narrowly tailored to serve that interest.

[12] *In re Oliver,* 333 U.S. 257, 270 (1948).

to open court proceedings requires the highest level of judicial scrutiny, declaring that a court closing a courtroom must show "that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest."[13] A court must consider alternative means before engaging in a closure of the courtroom: "Absent consideration of alternatives to closure, the trial court could not constitutionally close the voir dire."[14]

¶ 121. The Wisconsin statutes echo the strong constitutional protection of the public right to open court proceedings. The public right to open court proceedings has been entrenched in Wisconsin statutory law since the legislature declared in 1849: *"The sittings of every court within this state shall be public, and every citizen may freely attend the same."*[15]

¶ 122. The 1849 legislature's "clear and express legislative policy that courts are to be open to all the people"[16] has, over the last 165 years, remained in the statutes in the same language, with an "extremely limited" limitation on "the scope of this legislative mandate . . . that a court sitting shall be public"—a limitation not applicable to the present cases.[17] Wisconsin Stat. § 757.14 now provides as follows:

> *The sittings of every court shall be public and every citizen may freely attend the same,* except if otherwise expressly provided by law on the examination of persons charged with crime; provided, that when in any court a cause of scandalous or obscene nature is on trial the presiding judge or justice may exclude from the

---

[13] *Globe Newspaper Co.,* 457 U.S. at 606–07.

[14] *Press-Enterprise I,* 464 U.S. at 511.

[15] 1849 Rev. Stat. ch. 87, § 17.

[16] *La Crosse Tribune,* 115 Wis. 2d at 232.

[17] *Id.* at 231.

room where the court is sitting all minors not necessarily present as parties or witnesses (emphasis added).

¶ 123. In interpreting and applying Wis. Stat. § 757.14, the court has declared:

- Voir dire is presumptively to be open to the public.[18]

- In the proper exercise of discretion a circuit court may close a sitting of a court.[19]

- Exclusion of the public from voir dire may constitute an erroneous exercise of discretion on the part of the trial court.[20]

- The circumstances to close a courtroom must be compelling.[21]

- To close a courtroom, the circuit court must make findings of fact with specificity; the process must be a rational one and must be demonstrated on the record.[22]

- The tenor and general position of Anglo-American law is presumptively that a fair trial cannot be had unless the trial is open and subject to public scrutiny.[23]

¶ 124. The majority opinion concedes that the circuit court orders in the instant cases "likely violated Wis. Stat. § 757.14."[24]

¶ 125. In addition to the constitutional and statutory mandates, the public right to open court proceedings is rooted in our Anglo-American common-law

---

[18] *Id.* at 233.
[19] *Id.*
[20] *Id.* at 238.
[21] *Id.* at 223, 238, 240.
[22] *Id.*
[23] *Id.* at 236.
[24] Majority op., ¶ 40 n.12.

heritage.[25] The United States Supreme Court has detailed the common-law history of the public trial right, recognizing that it arose in response to the secret or closed trial, which "had become an instrument for the suppression of political and religious heresies in ruthless disregard of the right of an accused to a fair trial."[26] The public right to attend trial at common law extended not only to trial proceedings, but also to other essential court proceedings attached to trial, including jury selection and voir dire proceedings.[27]

¶ 126. The public right to open court proceedings "is a reflection of the notion, deeply rooted in the common law, that justice must satisfy the appearance of justice."[28] The value that anyone is free to attend court

---

[25] The Wisconsin Constitution adopted the common law unless otherwise altered or suspended by the legislature or modified by the courts. Article 14, Section 13 of the Wisconsin Constitution provides as follows:

> Section 13. Such parts of the common law as are now in force in the territory of Wisconsin, not inconsistent with this constitution, shall be and continue part of the law of this state until altered or suspended by the legislature.

For a more extensive history of the common-law public right to trial, see *Richmond Newspapers,* 448 U.S. at 563–75 (Burger, C.J., plurality op., joined by White, J. and Stevens, J.), which discusses at length the common-law roots of the public trial right, and notes that "[f]rom this unbroken, uncontradicted history, supported by reasons as valid today as in centuries past, we are bound to conclude that a presumption of openness inheres in the very nature of a criminal trial under our system of justice."

[26] *In re Oliver,* 333 U.S. 257, 269 (1948).

[27] *Press-Enterprise I,* 464 U.S. at 506–08 (describing the openness of jury selection processes at English common law and that "public jury selection thus was the common practice in America when the Constitution was adopted").

[28] *Levine v. United States,* 362 U.S. 610, 616 (1960) (internal quotation marks & citation omitted).

170

proceedings "gives assurance that established procedures are being followed and that deviations will become known."[29] Our constitutional, statutory, and common-law sources of law require that courts hold their doors open to guarantee the integrity of their judicial proceedings.

## II

¶ 127. Thus, three sources of law separately and in combination mandate that court proceedings be open. To whom are these mandates addressed? The courts!

¶ 128. The public right to attend court proceedings is not, as the majority opinion would have you believe, a right that requires a party to the litigation or a member of the public to act in order to enforce it. The responsibility to keep court proceedings open lies with each court.

¶ 129. Contrary to the majority opinion's protestations,[30] the issue of the circuit court's compliance with the right of the public to attend open court is now before this court. The constitutions, Wis. Stat. § 757.14, and the common law are mandates on the courts— mandates which the courts are required to observe regardless of the parties' or public's position.

¶ 130. As this court has noted in another context, a statutory mandate serves as a requirement on the courts themselves. The courts are obligated to obey those mandates, *sua sponte,* regardless of the parties' positions:

---

[29] *Press-Enterprise I,* 464 U.S. at 508 (internal quotation marks & citations omitted).

[30] Majority op., ¶ 40 n.12.

171

> The harmless error rule ... *is an injunction on the courts, which, if applicable, the courts are required to address regardless of whether the parties do. See* Wis. Stat. § 805.18(2) (specifying that no judgment shall be reversed unless the court determines, after examining the entire record, that the error complained of has affected the substantial rights of a party).

*State v. Harvey,* 2002 WI 93, ¶ 47 n.12, 254 Wis. 2d 442, 647 N.W.2d 189 (emphasis added).

¶ 131. Like the harmless error rule, the public right to open court proceedings is a mandate on the courts, which the courts, including this court, must address. Even an issue not raised by any party is properly before the court when our law places that responsibility on the court. The statute in the instant case explicitly directs that judicial proceedings "*shall* be public and every citizen may freely attend the same."[31]

¶ 132. The duty to ensure that this mandate is carried out falls on the judges of the state, including the justices of this court, who must maintain the integrity of the court system by following the law: "A judge shall respect and comply with the law . . . ."[32] The law requires that court proceedings be open, and "[t]he judge alone controls the courtroom . . . ."[33]

---

[31] Wis. Stat. § 757.14 (emphasis added). *Compare* Wis. Stat. § 805.18(2) ("No judgment *shall* be reversed or set aside or new trial granted . . . unless in the opinion of the court to which the application is made . . . it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial.") (emphasis added).

[32] SCR 60.03(1).

[33] *State v. Champlain,* 2008 WI App 5, ¶ 34, 307 Wis. 2d 232, 744 N.W.2d 889 (declaring that only a judge, not a jail

¶ 133. If court proceedings are to be closed, the court must articulate clear reasons on the record for contravening the explicit mandate of the Constitutions, statutes, and common law to keep court proceedings open:

> [T]he closure of a courtroom should ensue only when not to do so would defeat the very purpose of the court proceedings or would otherwise substantially impinge upon widely held public values which have been declared by the legislature in particular circumstances to supersede the general public policy of the open courtroom.
>
> . . . .
>
> [A]lthough a courtroom can be closed in the exercise of discretion, the circumstances necessary to trigger the discretion to close a courtroom must be compelling indeed.[34]

A court's power to close a proceeding may be exercised only if the court follows a procedure that balances a

administrator, can make a decision regarding restraints for a prisoner in the courtroom).

[34] *La Crosse Tribune,* 115 Wis. 2d at 235.

Sister states with similar statutory language have, like Wisconsin, required the courts to enforce the mandate for public court proceedings and have placed a heavy burden on courts to demonstrate a compelling reason for closure.

In interpreting a substantially similar statute providing for public access to open court, the California Supreme Court declared:

> The need to comply with the requirements of the First Amendment right of access may impose some burdens on trial courts. But courts can and should minimize such inconveniences by proposing to close proceedings only in the rarest of circumstances, as explained above. Accordingly, the burden imposed by requiring trial courts to give notice of a closure hearing and make the constitutionally required findings, and the ensuing burden imposed by permitting review of closure orders by extraordinary writ, will not unduly encumber our trial or appellate courts.

compelling interest in closing the courtroom against the public's interest in freely attending court proceedings:

> The trial judge should recite on the record the factors that impel him to close the courtroom and why such factors override the presumptive value of a public trial. The findings of fact must be made with specificity. The process must be a rational one, and the rationality of it must be demonstrated on the record, showing that the conclusion was reached on facts of record or which are reasonably derived by inference from the record. Upon review an appellate court should be able to determine from the record whether discretion was in fact exercised and whether a reasonable judicial mind could have reached the conclusion it did. A trial court is required to hold a hearing and publicly reach a conclusion based on the exercise of discretion prior to ordering a closing. The parties, and members of the public present in court, may appear at such hearing.[35]

¶ 134. It is thus the obligation of each court to make the public right to open judicial proceedings a reality.

### III

¶ 135. In the instant cases, the circuit court did not meet the necessary burden to justify closure of the courtroom, either under the constitutions, Wis. Stat. § 757.14, or the common law. In each of the instant cases, the circuit court did not articulate that it was exercising its discretion to close a courtroom "to assure

---

*NBC Subsidiary (KNBC-TV), Inc. v. Superior Court,* 980 P.2d 337, 371 (Cal. 1999).

[35] *La Crosse Tribune,* 115 Wis. 2d at 236–37 (cited by majority op., ¶ 76).

justice would not be thwarted"[36]; it failed to provide a compelling reason for closure; and it did not seek alternatives to closure. The circuit court thus improperly barred the public from the proceeding, as the majority opinion acknowledges.[37]

¶ 136. In *Seaton,* the circuit court gave the following justifications for its closing of the courtroom. First, the circuit court noted the comfort of seating the jurors:

> Obviously we're short on space. And [the jurors'] comfort and availability will not be compromised by anyone else in the courtroom if it becomes necessary, I'm just going to excuse everybody in the courtroom, that's the way it's going to be.

Later, the circuit court noted that it wanted to prevent disruptions in the courtroom or conversations with potential jurors:

> If there is one hint of one word of any juror at all for any reason, all are going out. Okay? I'm not going to pick and choose or identify any particular individual. Mum is the word while the Court is engaged in its voir dire . . . . And if one person says one thing or makes one comment that I can hear up here, the whole courtroom is going to be cleared of those individuals. All right?

¶ 137. Regarding the circuit court's first concern —the comfort of and availability of seating for the jurors—nothing in the record or in the case law suggests that this rationale rises to the level of a compelling government interest or that this interest could not have been met by alternative means.

¶ 138. Regarding the circuit court's second concern—disruptions created by members of the public —nothing in the record evidences any disruption by

---

[36] *La Crosse Tribune,* 115 Wis. 2d at 238.

[37] Majority op., ¶ 69.

members of the public. The circuit court issued its warning, but made no finding of any disruption.

¶ 139. In *Pinno,* the circuit court stated its reasoning for closure at the postconviction evidentiary proceeding as a generalized "interest of justice," "for other reasons," and as a "numbers issue":

> [T]he Court had no choice other than to limit admission of the public to the courtroom in the interest of justice and for other reasons that I'll comment on. But it was a numbers issue at that point.

¶ 140. The circuit court does not elaborate on any "interest of justice" or "other reasons" for closing the courtroom. As in *Seaton,* the circuit court justified closure on the number of jurors in the courtroom. As in *Seaton,* there was no evidence that the jury and the public could not, in some manner, have been accommodated in the courtroom safely.

¶ 141. Our case law requires that if court proceedings are to be closed, "[a] trial court is required to hold a hearing and publicly reach a conclusion based on the exercise of discretion prior to ordering a closing."[38] The circuit court held no such hearing prior to closure in the instant cases.

¶ 142. The circuit court did not demonstrate a compelling interest for excluding the public. The circuit court abdicated its constitutional, statutory, and common-law responsibilities. This court should not do the same.

¶ 143. I would reverse the judgments of the circuit courts and remand the causes to the circuit courts for a new trial.

---

[38] *La Crosse Tribune,* 115 Wis. 2d at 237. *See also* majority op., ¶ 76.

¶ 144. For the foregoing reasons, I dissent.

¶ 145. I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.

¶ 146. N. PATRICK CROOKS, J. *(dissenting)*. I join the reasoning set forth in Chief Justice Shirley S. Abrahamson's dissent concerning the public trial right guaranteed by the First Amendment. I write separately to focus on a defendant's Sixth Amendment right to a public trial and to address remedy in this context.

¶ 147. Courtroom closures, by their very nature, are extremely troubling. The circumstances under which a courtroom can be closed without violating a bedrock principle of our justice system—the right to a public trial—are rare. Travis Seaton and Nancy Pinno, the defendants in these consolidated cases, each asserts that voir dire proceedings during their criminal trials in Fond du Lac County were closed to the public apparently to make room for large jury venires. While these allegations alone are disconcerting, the record in Seaton's case demonstrates that these types of closures are apparently common practice in Fond du Lac County.[1] If there is to be a courtroom closure, there must be consideration and application of the *Waller*[2] factors because a defendant's Sixth Amendment right to

---

[1] Majority op., ¶ 19, n.7.

[2] *Waller v. Georgia,* 467 U.S. 39 (1984), adopted a four-part test first articulated in *Press-Enterprise Co. v. Superior Court (Press Enter. I),* 464 U.S. 501 (1984), under which a trial court may close courtroom proceedings under very limited circumstances despite a defendant's Sixth Amendment right to a public trial. In *Waller,* the United States Supreme Court stated,

Under *Press–Enterprise,* the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that

177

a public trial is absolutely rooted in the essential underpinning of our judicial system: fairness.

¶ 148. Considering that the public trial right is such a fundamental concept to our criminal justice system, I cannot agree with the majority's conclusion that a criminal defendant's failure to make a contemporaneous objection results in his or her forfeiture of that right. Contrary to the majority opinion, I assert that a defendant's public trial right, guaranteed by both the Sixth Amendment[3] and the Wisconsin Constitution,[4] can be given up only if the defendant affirmatively voices a willingness to do so. I would therefore

interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Waller,* 467 U.S. at 48. *See also* majority op., ¶ 45 (discussing *Waller*).

[3] The Sixth Amendment, in part, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. The Sixth Amendment public trial right is applicable to the states through the Fourteenth Amendment. *In re Oliver,* 333 U.S. 257, 273 (1948) ("In view of this nation's historic distrust of secret proceedings, their inherent dangers to freedom, and the universal requirement of our federal and state governments that criminal trials be public, the Fourteenth Amendment's guarantee that no one shall be deprived of his liberty without due process of law means at least that an accused cannot be thus sentenced to prison.").

[4] Wisconsin Const. art. I, § 7 provides:

In all criminal prosecutions the accused shall enjoy the right to be heard by himself and counsel; to demand the nature and cause of the accusation against him; to meet the witnesses face to face; to have compulsory process to compel the attendance of witnesses in his behalf; and in prosecutions by indictment, or information, to a speedy public trial by an impartial jury of the county or district wherein the offense shall have been committed; which county or district shall have been previously ascertained by law.

consider the right subject to waiver analysis. This conclusion results from consideration of the importance of the public trial right, the unique position of a violation of the right as a structural constitutional error, its concern with fairness, and persuasive authority from the United States Supreme Court and from other jurisdictions—all considerations that are minimized by the majority opinion.

¶ 149. In addition, I write separately to express my disagreement with the majority opinion's conclusion that prejudice should not be presumed when a claim of ineffective assistance of counsel is based on an alleged violation of the public trial right.[5] I recognize that under my use of waiver analysis, there would be no need to reach the ineffective assistance of counsel claims presented by these defendants. However, I am not persuaded by the majority opinion's discussion of the presumption of prejudice. At the outset, I agree with the majority that the presumption of prejudice is warranted under circumstances in which the harm of the error in question is difficult to measure. In contrast to the majority's position, however, I conclude that a public trial violation that occurs during voir dire is exactly the type of harm that may permeate an entire trial in incalculable ways. Therefore, contrary to the majority approach, I would presume prejudice in this context.

---

Although the defendants' arguments are based on the Sixth Amendment rather than the Wisconsin Constitution, I note that the public trial right under art. I, § 7 does not appear to be any different than the right under the Sixth Amendment.

I also note that Wis. Stat. § 757.14 requires that courtrooms remain open. Although this statute has potential applicability to this case, my focus is on a defendant's Sixth Amendment right to a public trial.

[5] Majority op., ¶ 9.

179

¶ 150. For these reasons, I respectfully dissent.

## I. A CHALLENGE TO A PUBLIC TRIAL RIGHT VIOLATION, A STRUCTURAL CONSTITUTIONAL ERROR, CANNOT BE FORFEITED.

¶ 151. The majority opinion carefully and thoroughly sets forth many of the principles underlying the Sixth Amendment public trial right. For example, there is no dispute that the Sixth Amendment provides a criminal defendant with the right to a public trial and that this public trial right extends to voir dire.[6] There is also no dispute that the Sixth Amendment public trial right, which serves four primary purposes, is not absolute.[7] Additionally, I agree with the majority that under *Waller,* the remedy for a violation of the Sixth Amendment public trial right must be appropriate considering the nature of the specific violation at issue.[8] Finally, I agree with the majority that some violations of the Sixth Amendment public trial right may be so trivial as

---

[6] *Id.,* ¶¶ 40, 43. In *Presley v. Georgia,* 558 U.S. 209, 213 (2010), the United States Supreme Court held that the Sixth Amendment public trial right applies to voir dire. It is of no importance that the Supreme Court decided *Presley* after the voir dire proceedings took place in both the Pinno and Seaton trials. This is because *Presley* explicitly asserts that the issue of whether the Sixth Amendment public trial right applies to voir dire was already a well-settled principle under *Press-Enterprise I* and *Waller,* which addressed the right under the First Amendment and the Sixth Amendment, respectively. *Id.* at 213.

[7] Majority op., ¶ 42 (discussing the four core values as outlined by *State v. Ndina,* 2009 WI 21, 315 Wis. 2d 653, 761 N.W.2d 612); majority op., ¶¶ 44–45 (discussing *Waller,* 467 U.S. at 45, 48).

[8] Majority op., ¶ 46.

not to warrant a remedy,[9] and I emphasize that the alleged closures at issue in these cases are not trivial.

¶ 152. The majority opinion provides a limited discussion of the importance of the Sixth Amendment public trial right[10] but does appear to recognize that the United States Supreme Court has included a violation of the right amongst a short list of structural constitutional errors, which are not subject to harmless error analysis.[11] The importance of the Sixth Amendment public trial right and the status of a violation of the right as a structural constitutional error are the reasons I take issue with the majority opinion.

## A. THE IMPORTANCE OF THE PUBLIC TRIAL RIGHT TO THE FAIRNESS OF CRIMINAL TRIALS

¶ 153. The Sixth Amendment public trial right results from the long-held belief that secret proceedings will not produce just results.[12] Thus the public trial right has long been recognized by our federal government as well as by the overwhelming majority of state governments, including Wisconsin.[13] Underlying this long-standing recognition of the public trial right is the concept that publicity ensures that criminal defendants

[9] *Id.,* ¶ 67, n.23.

[10] *Id.,* ¶ 41.

[11] *See id.,* ¶ 50.

[12] *Gannett Co. v. DePasquale,* 443 U.S. 368, 412 (1979); *In re Oliver,* 333 U.S. at 268–69 ("The traditional Anglo-American distrust for secret trials has been variously ascribed to the notorious use of this practice by the Spanish Inquisition, to the excesses of the English Court of Star Chamber, and to the French monarchy's abuse of the lettre de cachet.") (internal footnotes omitted).

[13] *See In re Oliver,* 333 U.S. at 266–68.

181

receive fair trials.[14] "Without publicity, all other checks are insufficient; in comparison of publicity, all other checks are of small account."[15]

¶ 154. Although the majority opinion sets forth four of the core values of the Sixth Amendment public trial right, it is worthwhile to set them forth again.

The [United States] Supreme Court has described four values furthered by the Sixth Amendment guarantee of a public trial: "(1) to ensure a fair trial; (2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; (3) to encourage witnesses to come forward; and (4) to discourage perjury."[16]

Although stated as four distinct values, each of these principles underlying the public trial right works to guarantee one fundamental concept of our criminal justice system: fairness. The United States Supreme Court's classification of a violation of the public trial right as a structural constitutional error further supports the contention that the public trial right is undoubtedly concerned with the fairness of criminal trials.

¶ 155. The United States Supreme Court divides constitutional errors into two categories.[17] Most constitutional errors are categorized as trial errors.[18] The

---

[14] *Id.* at 270 ("[T]he guarantee has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution.").

[15] *Id.* at 271 (quoting 1 Jeremy Bentham, *Rationale of Judicial Evidence* 524 (1827)).

[16] *Ndina,* 315 Wis. 2d 653, ¶ 49 (quoting *Peterson v. Williams,* 85 F.3d 39, 43 (2d Cir. 1996) (citing *Waller,* 467 U.S. at 46–47 (1984)).

[17] *United States v. Gonzalez-Lopez,* 548 U.S. 140, 148 (2006) (citing *Arizona v. Fulminante,* 499 U.S. 279 (1991)).

[18] *See Fulminante,* 499 U.S. at 306–08.

effect of these types of errors on criminal trials can be determined by considering the error in light of all of the evidence presented to the jury; therefore, this category of constitutional errors is subject to harmless error analysis.[19]

¶ 156. In a smaller category of constitutional errors are those that are not subject to harmless error analysis, and these are referred to as structural errors or defects.[20] In contrast to the effect of trial errors, the effect of structural errors on a trial cannot be determined because structural errors have the potential to taint the entire framework of a trial.[21] The United States Supreme Court has repeatedly recognized that a violation of the public trial right is a defect that is structural in nature.[22] In other words, while the specific effect of the error on the trial itself cannot be determined, the effects of a violation of the public trial right always have the potential to permeate the entirety of a criminal trial.

¶ 157. My emphasis on a violation of the public trial right as a structural constitutional error does not directly answer the important question of whether a forfeiture or a waiver analysis applies. However, this categorization, as I will explain, does inform my position on both the issue of whether waiver or forfeiture applies and the issue of whether prejudice should be presumed in an ineffective assistance of counsel claim. The designation of a public trial violation as structural

---

[19] *Id.* at 307–08.

[20] *See id.* at 309–10.

[21] *Id.*

[22] *Gonzalez-Lopez,* 548 U.S. at 148–49; *Neder v. United States,* 527 U.S. 1, 8 (1999); *Fulminante,* 499 U.S. at 310. In each of these cases the United States Supreme Court cited *Waller,* 467 U.S. 39.

error absolutely heightens the seriousness of this type of error when compared to constitutional violations categorized as trial errors. This is because, as noted above, the effect of a violation of the public trial right cannot be measured and always poses a threat to the fairness of the entire trial process.

¶ 158. It is these concepts—that the effect of a violation of the public trial right cannot be measured, and the public trial right's concern with fairness—that the majority fails to fully recognize. Instead of adhering to the two categories of constitutional errors established by the United States Supreme Court, namely trial errors and structural errors, the majority attempts to minimize the seriousness of a public trial right violation. It does so in two primary ways.

¶ 159. First, the majority opinion attempts to separate a violation of the public trial right from other structural errors and cast it into a category all its own. However, the majority's attempt to place the public trial right into a lesser category of structural constitutional rights is not supported by United States Supreme Court precedent.

¶ 160. It is of no importance that *Waller*, decided in 1984, did not use the phrase "structural error"[23] because the categories of structural error and trial error were not defined or utilized until the Court's 1991 decision in *Arizona v. Fulminante*.[24] While the Court had previously identified a very limited number of constitutional errors that were not subject to harmless error analysis, the *Fulminante* decision was the Supreme Court's first specific application of the dual categories (trial errors and structural errors) to its

---

[23] *See* majority op., ¶ 51.
[24] *Fulminante,* 499 U.S. 279.

prior decisions.[25] In *Fulminante,* the Supreme Court clearly relied on its prior decision in *Waller* when it included a public trial right violation as falling within the structural error category.[26]

¶ 161. I am also not persuaded that the United States Supreme Court's failure to use the phrase "structural error" in every case that addresses a violation of a structural constitutional right or the public trial right has any significance. In *Presley,* the Court applied *Press Enterprise I* and *Waller* to hold that the public trial right extends to voir dire.[27] The fact that the Court did not engage in a discussion of structural constitutional errors in *Presley* cannot be read as an indication that the Court has, in any way, backtracked from its prior holdings, which squarely placed a public trial right violation in the category of a structural constitutional error.[28]

¶ 162. Second, the majority opinion repeatedly relies on its conclusion that a public trial right violation does not automatically result in unfairness or prejudice to the defendant.[29] For example, the majority opinion states, "[T]he absence of the public does not automatically lead to misconduct or unfairness or any other circumstance prejudicial to the defendant."[30] However, this statement completely disregards the fact that the effect of a public trial right violation cannot be deter-

---

[25] *See* Roger A. Fairfax, Jr., *Harmless Constitutional Error and the Institutional Significance of the Jury,* 76 Fordham L. Rev. 2037–38 (2008) (discussing *Chapman v. California,* 386 U.S. 18 (1967), and *Fulminante,* 499 U.S. 279).

[26] *Fulminante,* 499 U.S. at 310.

[27] *Presley,* 558 U.S. at 212–13.

[28] *See supra* ¶ 10.

[29] Majority op., ¶¶ 59, 84, 86.

[30] *Id.,* ¶ 59.

mined. This is the very reason the United States Supreme Court has labeled this type of error a structural error.

¶ 163. Classification of a violation of the public trial right as a structural constitutional error does not answer the question of whether a waiver or forfeiture analysis applies. However, a discussion of the violation of the public trial right as a structural constitutional error highlights the importance of the public trial right and its concern with the fairness of criminal trials. Therefore, the discussion of a public trial right violation as a structural constitutional error informs my conclusion that waiver analysis is the applicable standard.

## B. A DEFENDANT'S SIXTH AMENDMENT PUBLIC TRIAL RIGHT CANNOT BE FORFEITED.

¶ 164. The importance of the public trial right, its categorization when violated as a structural constitutional error, and its concern with fairness inform my position. I also find support in both Wisconsin precedent and in case law from other jurisdictions, that waiver[31] rather than forfeiture should apply to a public trial right violation. Specifically, I find this court's recent decision in *State v. Soto*[32] as well as the United States Court of Appeals for the Seventh Circuit's decision in *Walton v. Briley*[33] to be strongly supportive of my position.

---

[31] As the majority sets forth, waiver, opposed to forfeiture, requires a defendant to affirmatively give up a known right. *See* majority op., ¶ 56; *see also Ndina,* 315 Wis. 2d 653, ¶ 29. When waiver applies, we usually require that such waiver be given knowingly and voluntarily. See *State v. Klessig,* 211 Wis. 2d 194, 564 N.W.2d 716 (1997), for a discussion of knowing and intelligent waiver in the context of a defendant's right to counsel.

[32] *State v. Soto,* 2012 WI 93, 343 Wis. 2d 43, 817 N.W.2d 848.

[33] *Walton v. Briley,* 361 F.3d 431 (7th Cir. 2004).

¶ 165. As the majority opinion sets forth, this court uses a balancing test, stated in *State v. Soto*,[34] to determine whether forfeiture or waiver applies.[35] "Therefore, when determining whether a right is subject to forfeiture or waiver, we look to the constitutional or statutory importance of the right, balanced against the procedural efficiency in requiring immediate final determination of the right."[36] While the majority opinion sets forth this balancing test, it considers procedural efficiency without sufficiently weighing that interest against the importance of the Sixth Amendment public trial right.

¶ 166. In *Soto*, this court determined that waiver, rather than forfeiture, applied to a defendant's statutory right to be present in the courtroom during a plea hearing.[37] *Soto* first recognized, in general, that the forfeiture rule has the benefit of procedural efficiency. We stated, "Rights that are subject to forfeiture are typically those whose relinquishment will not necessarily deprive a party of a fair trial, and whose protection is best left to the immediacy of the trial, such as when a party fails to raise an evidentiary objection."[38] However, we then explained that "waiver typically applies to those rights so important to the administration of a fair trial that mere inaction on the part of a litigant is not sufficient to demonstrate that the party intended to forgo the right."[39] We further explained that a defendant's statutory right to be present, in person,

---

[34] *Soto,* 343 Wis. 2d 43, ¶ 38.

[35] Majority op., ¶ 57.

[36] *Soto,* 343 Wis. 2d 43, ¶ 38.

[37] *Id.,* ¶¶ 34–35.

[38] *Id.,* ¶ 36.

[39] *Id.,* ¶ 37.

during the proceeding at issue was "particularly important to the actual or perceived fairness of the criminal proceedings."[40]

¶ 167. The court's emphasis in *Soto* on the connection between rights subject to waiver and those same rights' concern with fairness or perceived fairness of a criminal trial convinces me that requiring waiver, rather than permitting forfeiture, is the correct approach. As discussed previously, the public trial right is an exceedingly important constitutional right that is absolutely tied to the actual or perceived fairness of a criminal trial. It is of no consequence that a public trial right violation may not actually affect fairness because whether the violation permeates the trial is a question an appellate court simply cannot evaluate in the same way that an appellate court can evaluate the effect of an evidentiary error. Like a defendant's statutory right to be present in person, a defendant's constitutional right to a public trial must be subject to waiver, not forfeiture.

¶ 168. Furthermore, the fact that juvenile proceedings are often closed to the public, or that some criminal proceedings may be void of spectators, is of no importance. First, most jurisdictions do not recognize a public trial right in the context of juvenile adjudications because of the overriding confidentiality interest as well as the noncriminal nature of the proceedings.[41] Second, it is not the actual presence of spectators that ensures fairness of criminal trials, but instead it is the fact that the public could easily access and observe criminal proceedings at any moment.[42]

---

[40] *Id.,* ¶ 40.

[41] Susan N. Herman, *The Right to a Speedy and Public Trial* 91 (2006).

[42] *See Press-Enter. I,* 464 U.S. at 508 ("The value of openness lies in the fact that people not actually attending trials can have

¶ 169. Although I conclude that a criminal defendant must voluntarily and knowingly waive his or her right to a public trial to give up that right, I acknowledge that there is no doubt that permitting forfeiture encourages efficiency by both the prosecution and defense by bringing timely objections to the circuit court's attention. The benefit of efficiency, however, does not outweigh the necessity of safeguarding the public trial right. This is especially true considering that the purpose of the public trial right is to ensure fairness of every aspect of a criminal trial.

¶ 170. The decision in *Walton v. Briley*[43] further persuades me that waiver is the correct approach. In *Walton*, the United States Court of Appeals for the Seventh Circuit held that a criminal defendant cannot forfeit his or her right to a public trial.[44] The *Walton* decision explained that waiver has been required of a variety of fundamental trial rights, such as "plea agreements, the right against self-incrimination, the right to a trial, the right to a trial by jury, the right to an attorney, and the right to confront witnesses."[45] The United States Court of Appeals for the Seventh Circuit noted that the abovementioned rights were all concerned with "the fairness of the trial" and then concluded that "[t]he right to a *public* trial also concerns

confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known."); *see also In re Oliver,* 333 U.S. at 270 ("The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.").

[43] *Walton,* 361 F.3d 431.

[44] *Id.* at 434.

[45] *Id.* at 433–34 (citations omitted).

the right to a *fair* trial."[46] I agree, as previously noted, that the Sixth Amendment's concern with fairness requires that a waiver, rather than a forfeiture, analysis applies to an alleged public trial right violation.

¶ 171. In addition, I am persuaded that waiver analysis can coexist with the four *Waller* factors.[47] An application of a waiver analysis does not change the fact that the public trial right is not absolute, and that a court may close a courtroom only after consideration of the four *Waller* factors.[48] However, when a courtroom closure does not satisfy the *Waller* factors, under a waiver approach, a closure can occur only if a defendant voluntarily and knowingly agrees to the closure.[49]

¶ 172. Finally, I am not persuaded that language in prior United States Supreme Court decisions supports forfeiture rather than waiver analysis.[50] The United States Supreme Court has not definitively addressed whether waiver or forfeiture applies to a public trial violation. The defendant in *Waller* did object to the closure in his case, and the Court's holding makes note of that fact.[51] However, there is no indication that the Court would have reached a different result in that case had the defendant not objected to the closure. Additionally, although the majority finds *Peretz v. United*

---

[46] *Id.* at 434 (citing *Waller,* 467 U.S. at 46).

[47] *See* majority op., ¶ 60.

[48] For a discussion of the *Waller* factors see majority op., ¶ 45.

[49] This statement addresses a defendant's Sixth Amendment right to a public trial and does not take into consideration situations in which members of the public, including the press, object to courtroom closures under the First Amendment.

[50] *See* majority op., ¶¶ 62–63.

[51] *Waller,* 467 U.S. at 42, 47.

*States*[52] and *Levine v. United States*[53] persuasive, I find those cases clearly distinguishable and therefore not supportive of a forfeiture analysis. This is because *Levine* evaluated the public trial right under the Due Process Clause and not the Sixth Amendment.[54] Thus the *Levine* decision answered only the narrow question of whether a defendant's failure to object to the secrecy of a contempt proceeding violated the Due Process Clause.[55] In addition, I am not persuaded that *Peretz,* which cites to *Levine* broadly and fails to clarify that *Levine* considered the Due Process Clause and not the public trial right under the Sixth Amendment, supports a forfeiture analysis.[56]

¶ 173. The Sixth Amendment public trial right is one very important tool by which we guarantee the fairness of criminal trials. The majority opinion has compromised this important guarantee and has minimized the importance of the public trial right by allowing a defendant to forfeit a right so essential to the core of our judicial system. Furthermore, the forfeiture analysis applied by the majority opinion does nothing to prohibit the practice of improper courtroom closure, which at least in Fond du Lac County appears to be common practice. In contrast, requiring waivers upholds the important purpose of the public trial right and encourages courts to keep trials open to the public. Of course, under *Waller,* overriding interests may necessitate closure under rare circumstances.

---

[52] *Peretz v. United States,* 501 U.S. 923 (1991).

[53] *Levine v. United States,* 362 U.S. 610 (1960).

[54] *See id.* at 616 (stating that "[p]rocedural safeguards for criminal contempts do not derive from the Sixth Amendment").

[55] *Id.* at 616–17.

[56] *See Peretz,* 501 U.S. at 936.

## C. REMEDY UNDER A WAIVER ANALYSIS

¶ 174. Because I would apply waiver and neither Pinno nor Seaton voluntarily or knowingly waived their right to a public trial, I briefly address the remedy each defendant should receive.

¶ 175. In Seaton's case, the circuit court denied his request for an evidentiary hearing and concluded that the courtroom was never closed. However, Seaton's postconviction motion included sufficient facts to warrant an evidentiary hearing on whether the courtroom was closed. Therefore, in Seaton's case the proper remedy, under a waiver analysis, would be a remand for an evidentiary hearing to determine whether the courtroom was closed during voir dire. That hearing should be before a circuit court judge other than the one who denied the original request for an evidentiary hearing. If an evidentiary hearing revealed that the courtroom was closed during voir dire, then analysis of whether the circuit court had considered the *Waller* factors would also be necessary. If not, then the *Waller* factors must be considered and applied, and the ultimate remedy would depend on whether the *Waller* factors were satisfied.

¶ 176. In Pinno's case, under a waiver analysis, the remedy should be different because she already received an evidentiary hearing on the issue of courtroom closure, which she raised in her postconviction motion. During this evidentiary hearing, the circuit court concluded that the courtroom was never closed. Specifically, the circuit court stated:

> So I just want to certainly emphasize that the courtroom was never closed. It was never locked. It was never secured. Rather this Court was doing nothing more than exercising its inherent power to encourage limiting the admission of public to the courtroom only during the voir dire process given the jury panel of 85 potential jurors . . . .

However, before voir dire began in Pinno's case, and just prior to seating the jury venire in the courtroom, the circuit court remarked:

> Other than the jury, nobody will be in the courtroom. Okay. So just have the jury panel in here. I want no one else in here during the entire voir dire process until the jury is selected. Any press in here? (No response.) I want no press in here either.

¶ 177. Based on the statements the circuit court made on the record just prior to voir dire, I would hold the circuit court's conclusion, that the courtroom was never closed, to be clearly erroneous.[57] Therefore, in Pinno's case, the proper remedy should be consideration and application of the *Waller* factors to the facts of record, and if a violation of Pinno's public trial right is determined to have occurred, then a new trial is a remedy. A circuit court judge other than the one who found that no closure had occurred would need to be assigned to Pinno's case.

## II. A VIOLATION OF THE PUBLIC TRIAL RIGHT SHOULD RESULT IN THE PRESUMPTION OF PREJUDICE IN AN INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM.

¶ 178. I recognize that, under the waiver approach that I would apply, it is unnecessary to address the additional issue of whether prejudice should be

---

[57] The fact that the jury clerk testified during the evidentiary hearing that the courtroom was never locked and that she thought she remembered people coming in and out of the courtroom does not change my conclusion. The jury clerk could not specifically identify or describe any person, other than members of the jury venire, who observed the voir dire proceedings.

presumed when an ineffective assistance of counsel claim is based on an alleged public trial right violation. However, I write separately to briefly explain why, contrary to the majority opinion, prejudice should be presumed in this context.

¶ 179. As the majority recognizes, this court has presumed prejudice in the context of ineffective assistance of counsel in cases where the harm of the error in question could not easily be measured.[58] However, the majority opinion disregards our prior jurisprudence by again concluding that a public trial violation does not always result in a "manifest injustice."[59] This conclusion misses the mark because the focus should be the inability of courts to measure the effect of a public trial violation. Therefore, as I have previously noted, it is insignificant that a manifest injustice may not result every time a courtroom is unlawfully closed. Since the effect of a public trial right violation cannot be measured, prejudice must be presumed, consistent with the applicable case law discussed.

## III. CONCLUSION

¶ 180. Courtroom closures, by their very nature, are extremely troubling. The circumstances under which a courtroom can be closed without violating a bedrock principle of our justice system—the right to a public trial—are rare. Travis Seaton and Nancy Pinno, the defendants in these consolidated cases, each asserts that voir dire proceedings during their criminal trials in Fond du Lac County were closed to the public apparently to make room for large jury venires. While these

---

[58] Majority op., ¶ 84 (discussing *State v. Smith,* 207 Wis. 2d 258, 280–81, 558 N.W.2d 379 (1997)).
[59] *Id.*

allegations alone are disconcerting, the record in Seaton's case demonstrates that these types of closures are apparently common practice in Fond du Lac County. If there is to be a courtroom closure, there must be consideration and application of the *Waller* factors because a defendant's Sixth Amendment right to a public trial is absolutely rooted in the essential underpinning of our judicial system: fairness.

¶ 181. Considering that the public trial right is such a fundamental concept to our criminal justice system, I cannot agree with the majority's conclusion that a criminal defendant's failure to make a contemporaneous objection results in his or her forfeiture of that right. Contrary to the majority opinion, I assert that a defendant's public trial right, guaranteed by both the Sixth Amendment and the Wisconsin Constitution, can be given up only if the defendant affirmatively voices a willingness to do so. I would therefore consider the right subject to waiver analysis. This conclusion results from consideration of the importance of the public trial right, the unique position of a violation of the right as a structural constitutional error, its concern with fairness, and persuasive authority from the United States Supreme Court and from other jurisdictions, all considerations that are minimized by the majority opinion.

¶ 182. In addition, I write separately to express my disagreement with the majority opinion's conclusion that prejudice should not be presumed when a claim of ineffective assistance of counsel is based on an alleged violation of the public trial right. I recognize that under my use of a waiver analysis, there would be no need to reach the ineffective assistance of counsel claims presented by these defendants. However, I am not persuaded by the majority opinion's discussion of the presumption of prejudice. At the outset, I agree with the

majority that the presumption of prejudice is warranted under circumstances in which the harm of the error in question is difficult to measure. In contrast to the majority's position, however, I conclude that a public trial violation that occurs during voir dire is exactly the type of harm that may infiltrate an entire trial in incalculable ways. Therefore, contrary to the majority approach, I would presume prejudice in this context.

¶ 183. For these reasons, I respectfully dissent.

¶ 184. I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.

